Nathaniel HOARD, Plaintiff,

v.

TELETYPE CORPORATION, Defendant,

Richard Davis, Plaintiff-Intervenor.

Civ. No. LR–74–C–381.

United States District Court,
E. D. Arkansas, W. D.

May 8, 1978.

**1060**

P. A. Hollingsworth, Hollingsworth, Bilheimer & Crutcher, Little Rock, Ark., for plaintiff and plaintiff-intervenor.

Richard Mays, Walker, Kaplan & Mays, Little Rock, Ark., for intervenors Burlon Joiner and Alma Gipson.

Robert S. Lindsey, Wright, Lindsey & Jennings, Little Rock, Ark., for defendant.

HEANEY, District Judge, by designation.

## FINDINGS OF FACT

1. The plaintiff Nathaniel Hoard is black. He was employed by the defendant Teletype Corporation from November 8, 1965 until his discharge on October 16, 1972. He is an appropriate class representative for a Rule 23(b)(2) class consisting of all black employees who allege that they were discharged on account of race by Teletype from December 3, 1971 to September 6, 1977.

2. Richard Davis is black. He has been employed by Teletype since March 16, 1964. He was permitted to intervene by this Court on June 3, 1977. He is an appropriate class representative for all black employees currently employed by Teletype who allege that they were denied promotions to higher ranking positions or denied assignments to jobs paying a higher rate of pay on account of race since December 3, 1971. The higher ranking positions and jobs to which the class alleges it has been denied promotion or assignment to are as follows:

Grades 95 to 98 inclusive.
Job Setters and Machine Setters.
Trade Groups I and Trade Groups II, excluding electricians, toolmakers and any other positions established by the record to be hired primarily from the outside.
Grades 505 to 510 inclusive.
The EA (Engineering Associates).
The Ungraded Series (UG1 to UG3 inclusive) and other professionals, excluding those hired primarily from outside Teletype's work force.
Section Chiefs.
Department Chiefs.

This is a definable class, all of the members can be identified by name. The number in the class is so numerous that joinder is impracticable. The claims of each member of the class involve common questions of law and fact. The challenged practice of not promoting black employees because of their race affects each member of the class in a comparable manner. The claim of the named plaintiff is typical of the claims of the class and the named plaintiff has fairly and adequately represented the interests of the class.

3. Teletype Corporation is an employer within the contemplation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* It is a wholly owned subsidiary of Western Electric which in turn is a wholly owned subsidiary of American Telephone and Telegraph. It has operated a plant in Little Rock, Arkansas since 1957. At all times material to this action, Teletype has been an employer within the contemplation of 42 U.S.C. § 2000e(b). Since 1970, the work force has varied from a low of 1,200 to the present high of 2,200.

4. Burlon Joiner and Alma Gipson, black discharged employees of Teletype, petitioned to intervene as plaintiffs on October 12, 1977. Permission was subsequently granted.

5. The following black employees who had been discharged by Teletype between December 3, 1971 and September 6, 1977, affirmatively opted into Class I:

Wanda McKee
Violet Allen
Sharon Greene
Paulette Hinton
Diane McGhee
Barbara Surratt
Glenn Robinson
James Wiggins
Lewis Henderson
Raymond Trice

The class of discharged employees was limited by the Court to Nathaniel Hoard and those individuals listed in paragraphs 4 and 5.

6. When the Teletype plant was opened in Little Rock in 1957, it did not hire any blacks as production employees, clerical employees, or employees in any of the categories set forth in paragraph 2. The only blacks that it hired were employed as janitors.

7. The first black employed by Teletype in a position other than as a janitor was hired in 1960. By July 1, 1962, one black was employed in a clerical position, five blacks were employed in production positions in grades 91 through 93, and no blacks were apparently employed in higher positions. As of July 30, 1964, only 28 or 7% of the 393 employees were black. Of these, two were clerical employees, three were janitors, twenty were unskilled production employees, and three were semiskilled production employees.

8. There were blacks living in Little Rock at the time the plant was opened and through 1964 who were qualified for most positions in the company, including production, craft, clerical, professional and supervisory positions. At the time of the enactment of Title VII, blacks were underrepresented in most classifications in the work force at Teletype.

9. Race was a factor in the failure of Teletype to employ blacks other than in janitorial positions in the plant until 1960.

10. Teletype had no affirmative action plan to bring qualified blacks into its Little Rock plant until 1970 when Lafayette Morrison, the Equal Employment Opportunity Coordinator, was sent from the Teletype plant in Skokie, Illinois, to initiate the writing and implementation of an affirmative action plan. Between 1970 and the time of trial, Morrison made 23 visits to Little Rock to assist in affirmative action activities. No EEO coordinator was appointed for the Little Rock plant until 1971. The EEO coordinators appointed by Teletype for the Little Rock facility, were not properly trained or given adequate direction and support, and were unable to provide an effective affirmative action program.

11. At the time of trial, of the 119 blacks hired between 1971 and 1974, twenty or 16.5% had advanced to grade 94; six or 5% had advanced to grade 95; and only two or 1.7% were employed at grade levels above 95.

12. At the time of trial, of the 281 whites hired from 1971 to 1974, 47 or 17% advanced to grade 94; ten or 4% had advanced to grade 95; and 24 or 8.5% had advanced to grades above 95.

13. At the time of trial, of the 119 blacks hired between 1971 and 1974, only four were hired into positions above grade 93. Of the 281 whites hired during the same period, 45 were hired into positions above grade 93.

14. At the time of trial, Teletype employed one vice president, two managers and three assistant managers. No black has ever been employed by Teletype in any of those positions.

15. At the time of trial, Teletype employed 22 department chiefs. No black has ever been employed in this position.

16. At the time of trial, Teletype employed 63 section chiefs of whom only five are black. The first black was employed as a section chief in 1970. The second black so employed was the intervenor Richard Davis in 1971.

17. At the time of trial, Teletype employed approximately 45 persons as designers and engineers. These are considered professional positions and most persons holding such positions have appropriate college degrees. Teletype has never employed a black in these positions.

18. At the time of trial, Teletype employed approximately 100 persons in the trade group classifications. Included in these classifications are approximately 50 toolmakers, fifteen electricians, four water and waste treatment plant operators, and three test set makers. Only five blacks are presently employed in the trade group job classifications.

19. At the time of trial, there were 396 employees in grades 95 through 98 of whom 73 or 18.4% were black, and 323 or 81.6% were white.

| Grade | White Employees | % White Employees | Black Employees | % Black Employees | Total Employees |
|-------|-----------------|-------------------|-----------------|-------------------|-----------------|
| 95 | 158 | 78.6 | 43 | 21.4 | 201 |
| 96 | 53 | 75.7 | 17 | 24.3 | 70 |
| 97 | 102 | 88.7 | 13 | 11.3 | 115 |
| 98 | 10 | 100 | 0 | 0 | 10 |
| TOTAL in Grades 95–98 | 323 | 81.6 | 73 | 18.4 | 396 |

20. Since September 18, 1959, the International Brotherhood of Electrical Workers (IBEW) has been the certified collective bargaining representative for hourly rated production and maintenance employees, excluding clerical and professional employees, watchmen, guards and supervisory employees. Under the terms of the collective bargaining agreement, seniority is a factor but is not controlling in movement of employees within the bargaining unit. In grades 91 and 92, there is plant-wide seniority. In grade 93 experience in a related area is also important and in grades 94 through 98, TGI and TGII experience in a specific production line is important. Within a labor grade, advancement from one pay rate to another is automatic. Management retains final approval of movement within the production unit.

21. In 1970, blacks constituted 18.5% of the population in the Little Rock-North Little Rock Standard Metropolitan Statistical Area (SMSA). U.S. Bureau of the Census, Census of the Population: 1970, Vol. 1, CHARACTERISTICS OF THE POPULATION, Arkansas, Part 5, Table 174, p. 632. In 1976, blacks constituted 15.5% of the civilian labor force over sixteen years of age and older in the Little Rock-North Little Rock SMSA. Arkansas Employment Security Division, *Manpower Information for Affirmative Action Programs* (1977).

22. The following statistical chart was prepared by the defendant and is reasonably representative of data submitted by the defendant for the purpose of showing that since 1970 Teletype has employed blacks in the classifications shown in a ratio reasonably related to the blacks in the community available and qualified for such positions:

| | % Black Availability | 1970–1977 % Black Employment | 1977 % Black Employment |
|-------|---------------------|------------------------------|-------------------------|
| Manager | 2.95 | 3.07 | 4.82 |
| Professional | 2.09 | 2.56 | 2.38 |
| Technical | 4.19 | 7.09 | 5.88 |
| Clerical | 6.38 | 10.29 | 11.96 |
| Craft | 8.20 | 4.03 | 6.94 |
| Operative | 26.53 | 23.39 | 27.33 |
| Service | 32.48 | 0 | 0 |
| Overall | 21.15 | 18.35 | 21.51 |

This chart, and others like it received in evidence, while probative, is not entitled to controlling weight on the question of whether blacks were discriminated against in hiring or promotions from 1970 to the time of trial. The categories are too broad to be determinative in this case. For example, the category "managers" includes all supervisors from section chief to vice president, even though no blacks have held supervisory positions above that of section chief. The category "professional" includes

all professionals from administrative non-supervisory employees (ANSE) to accountants, designers and no blacks have held the latter professional positions.

23. Teletype continued to discriminate against blacks in hiring in all positions other than service, clerical, and operative positions below grade 95 until at least 1971. Thereafter, and until the commencement of this action, it hired more blacks into operative positions and employed some blacks in trade group, technician and lower grade professional positions but continued to discriminate against blacks in hiring with respect to higher grade professional and supervisory positions. There is insufficient evidence to establish that discrimination in initial hiring continued after the commencement of this action.

24. Teletype uniformly discriminated against blacks with respect to promotions above grade 95 and to supervisory positions until approximately 1970. Thereafter, it promoted a few blacks to section chief and to grades 96 through 98, but it continued to discriminate against most blacks with respect to promotion to supervisory positions or to grades above 95 until the commencement of this action. The discrimination cannot be explained or justified by the seniority provisions of the collective bargaining agreement or the seniority practices of the company.

25. Violet Allen, Sharon Greene, Paulette Hinton, Diane McGhee, Barbara Surratt, Glenn Robinson, James Wiggins, Lewis Henderson and Raymond Trice were discharged by Teletype for reasons unrelated to their race.

26. Nathaniel Hoard was first employed by Teletype on November 1, 1965 as a bench hand in grade 91, the lowest production job classification. He was paid $1.44 per hour. At the time of his employment he had completed high school and nearly four years of college. He performed satisfactorily as an employee and advanced from grade 91 to grade 95. On April 3, 1972, Hoard was downgraded to a grade 94. Beginning in May of 1972, Hoard received written warnings for absenteeism, poor work, and inefficiency. He was terminated on October 16, 1972. Had it not been for his race, Hoard would, in the light of his educational qualifications, have been hired at a higher grade and would have advanced more rapidly. While this treatment by Teletype was demeaning and may well have played a part in his generally unsatisfactory record immediately prior to his discharge, the evidence does not clearly establish that this was the case. Hoard was not discharged because of his race.

27. Burlon Joiner was terminated for reasons unrelated to his race.

28. Alma Gipson and Wanda McKee were allegedly terminated because of absenteeism and tardiness. Both were frequently absent and tardy, but their records in these respects were not as bad as white employees holding similar positions. Moreover, the absence control program was confusing and not communicated or understood by many of the employees, and was not enforced equally as to blacks and whites. Race was a factor in the discharge of Gipson and McKee. I specifically credit the testimony of the two employees that white employees in their departments were not written up for absenteeism similar to those for which they were written up, and that whites with worse absentee or tardiness records were not suspended or discharged.

29. The parties have stipulated that the individual claims and actions of Nathaniel Hoard, Burlon Joiner, Alma Gipson and Wanda McKee may be dismissed without prejudice.

30. Richard Davis was initially employed by Teletype on March 16, 1964, as a grade 91 bench hand at a salary of $1.33 an hour. During his employment at Teletype, he attended the Arkansas Baptist College and received a bachelor's degree in social science in 1973. He is an intelligent and articulate man. He has a very good record for efficiency, dependability and attendance. Davis is highly motivated. He has ambition to succeed with the company and to advance to higher management positions, and has done everything possible to fit himself for such promotions. By August 25,

1969, he had reached the grade of 97. On February 1, 1970, he was named a section chief. He was an able and effective section chief and totally a loyal and dedicated employee. He was the second black in the history of Teletype's Little Rock plant to be promoted to that position. On July 6, 1970, he was downgraded from a section chief to an ungraded position as a buyer associate. He was subsequently downgraded in steps to a grade 95. This downgrading was not racially motivated, but was instead the result of a substantial reduction in force. Davis was reappointed from grade 95 to a section chief on June 15, 1975. He continued in that position until February 19, 1975 when he was downgraded to a grade 97. Until the time of trial, he had not been promoted to section chief, even though more than one vacancy occurred. Race was a factor in his demotion on February 19, 1975 and in the failure of Teletype to repromote him to section chief when vacancies occurred. The testimony of Teletype witnesses is specifically discredited with respect to alleged deficiencies in Davis's work after his reappointment to section chief in June of 1975.

31. The record as a whole, including the testimony of Lafayette Morrison, established that Teletype moved slowly over the years in providing promotional opportunities for blacks. Initially it hired them only in the very lowest categories. Over the years it expanded their opportunities, but race remained a factor in promotional policies from the time the plant opened in 1957 until the date of trial. While more and more jobs were open to blacks, some positions were still denied them as of the date of trial.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction herein by virtue of 42 U.S.C. § 2000e *et seq.*, 28 U.S.C. § 1343, and 42 U.S.C. § 1981.

■ 2. A Rule 23(b)(2) class (Class I), consisting of all black employees discharged on account of race from Teletype's Little Rock plant from December 3, 1971 to September 6, 1977 is a proper one, and plaintiff Nathaniel Hoard is an appropriate class representative. In the interest of the fair conduct of the action, Fed.R.Civ.P. 23(d)(2), notice was required to be given to all employees in Class I.

3. The plaintiffs have failed to establish that Violet Allen, Sharon Greene, Paulette Hinton, Diane McGhee, Barbara Surratt, Glenn Robinson, James Wiggins, Lewis Henderson and Raymond Trice, were discharged on account of or by reason of their race and the defendant is entitled to a judgment with respect to them.

4. The claims of Nathaniel Hoard, Burlon Joiner, Alma Gipson and Wanda McKee shall be dismissed with prejudice pursuant to the stipulation of the parties. The findings that race was a factor in the discharge of Gipson and McKee, and that race was a factor in the failure to promote Hoard are relevant only insofar as they tend to establish that Teletype discriminated against black employees with respect to discharge and promotion.

■ 5. A prima facie case of discrimination with respect to Class I has not been made. While there is evidence in the record to indicate that Teletype's absence control program has not always been operated without regard to race, the instances were not so pervasive to require that injunctive relief be granted, and appear to have been eliminated by the time of trial.

■ 6. A Rule 23(b)(2) class (Class II), consisting of all black employees employed by Teletype at its Little Rock plant as of September 6, 1977 who had been denied promotions to the positions listed below on account of race since December 3, 1971 is proper, and Richard Davis is an appropriate class representative:

Grades 96 to 98 inclusive.

Job Setters and Machine Setters.

Trade Groups I and Trade Groups II, excluding electricians, toolmakers and any other positions established by the record to be hired primarily from the outside.

Grades 505 to 510 inclusive.

The EA (Engineering Associates).

The Ungraded Series (UG1 to UG3 inclusive) and other professionals, excluding those hired primarily from outside Teletype's work force.

Section Chiefs.

Department Chiefs.

■ 7. A prima facie case of discrimination has been established with respect to the following job classifications in Class II:

Grades 97 and 98.

Section Chiefs.

Department Chiefs.

Teletype has failed to rebut the prima facie case with respect to the above listed job classifications.

8. Teletype did satisfy their burden of proof with respect to the remaining job classifications in Class II as originally certified.

■ 9. Richard Davis, as a member of Class II, is entitled to relief. He is entitled to back pay from February 19, 1975 to the date he is reinstated to the position of section chief. The back pay is to be computed on the basis of the difference between what he would have earned as a section chief and the amount he did earn. Moreover, he is to be reinstated as a section chief when the first vacancy occurs in a section in which he has had prior experience. Teletype is enjoined from discriminating against Davis in the future with respect to his future advancement in the company.

■ 10. Teletype is enjoined from discriminating against black employees with respect to promotions to the job classifications listed in paragraph 7 of the conclusions of law. To effectuate the terms of this injunction, Teletype shall promptly adopt standards, which shall be primarily objective in nature, for promotion to those job classifications. The standards shall be promptly submitted to counsel for Class II members for their approval. The parties may request the assistance of the EEOC in the promulgation of the standards. If the parties are unable to agree, they shall request the Court to review the proposed standards.

The new standards for promotion to those job classifications shall be posted or otherwise made available to all employees.

11. Black employees of Teletype as of September 6, 1977, who claim that they were denied promotion to one of the job classifications set forth in paragraph 7 of the conclusions of law, prior to that date on account of race, and who were employed as of that date in grades 96 and above, and in equivalent ranking positions, are herewith given an opportunity to present their claims to this Court. Such employees shall be given appropriate notice of their opportunity to file claims within ten days of the date judgment is entered. Each claim must be presented to this Court within 60 days of the date that judgment is entered and must be accompanied by detailed affidavits setting forth the basis of the claim. Teletype shall have a period of 30 days thereafter to file counter affidavits. If requested by either party, the Court will take oral testimony to supplement the affidavits. Should Teletype fail to rebut an individual employee's claim of discrimination, the employee shall be entitled to an appropriate award of back pay and to promotion to available vacancies in accordance with an order to be entered by this Court.

12. The Court awards attorney's fees in the sum of $2,000 to Richard Mays, and $2,000 to Les Hollingsworth as counsel for the prevailing parties in a Title VII action. 42 U.S.C. § 2000e–5(k). These fees are to compensate counsel for all services rendered to date in this matter. The Court specifically instructed counsel for the plaintiffs to submit a request for additional attorney's fees with documentation at the time they submitted their proposed findings of fact and conclusions of law. They have not done so. Counsel may submit a documented request for additional attorney's fees arising with respect to future proceedings in this matter before this Court.

13. Judgment will be entered in accordance with these findings of fact, conclusions of law and memorandum.

## MEMORANDUM

On December 3, 1974, Nathaniel Hoard filed this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, alleging that Teletype Corporation discriminated on the basis of race. The action was brought in the District Court for the Eastern District of Arkansas. Richard Davis was permitted to intervene in this action by an order granted by Judge G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas and filed June 3, 1977. Burlon Joiner and Alma Gipson filed a motion to intervene on October 12, 1977, which was granted by the Court.

The action was denominated as a class action, the existence of a class was pleaded in the complaint and class certification was sought. After a preliminary hearing, this Court conditionally certified the two classes set forth in paragraphs 1 and 2 of the findings of fact as proper classes under Fed.R.Civ.P. 23. This Court found that the requirements of numerosity, the predomination of common questions of law or fact, typicality of claims and defenses, and adequacy of representation of Fed.R.Civ.P. 23(a)(1)–(4) were satisfied. *See generally Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir. 1977); *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122 (5th Cir. 1976); Schlei & Grossman, *Employment Discrimination Law* 1095–1107 (1976). The Eighth Circuit has stated that,

> [w]e are committed to the proposition that Rule 23 should be liberally construed to effectuate the remedial policy of Title VII since the conduct therein proscribed is discrimination against a class characteristic.

*Wright v. Stone Container Corp.*, 524 F.2d 1058, 1061–1062 (8th Cir. 1975). The class action is appropriately brought pursuant to Fed.R.Civ.P. 23(b)(2) which provides for class actions where

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Mandatory notice is not required for Rule 23(b)(2) class actions. By its terms, the mandatory notice provision only applies to 23(b)(3). *See Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). However, notice may be given under Rule 23(d)(2).

■ The plaintiffs have the burden of establishing a prima facie case of discrimination. There is no "inflexible formulation" of what constitutes a prima facie case; it varies with respect to differing factual situations. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Williams v. Anderson*, 562 F.2d 1081, 1088 (8th Cir. 1977). In this case, the plaintiffs sought to establish claims of disparate treatment. In such cases, proof that a discriminatory motive was a motivating factor is required though it need not be established that the discriminatory purpose was the sole motivating factor. *See Arlington Heights v. Metro. Housing Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). A discriminatory motive in some cases can be inferred from the mere fact of differences in treatment. *See International Brotherhood of Teamsters v. United States, supra*, 431 U.S. at 335 n. 15, 97 S.Ct. 1843; *Arlington Heights v. Metro. Housing Corp., supra*, 429 U.S. at 265–266, 97 S.Ct. 555. It has been recognized that admission of discriminatory intent is unlikely and such intent will ordinarily have to be found by "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Arlington Heights v. Metro. Housing Corp., supra* at 266, 97 S.Ct. at 564, including the impact, the historical background and individual instances of discrimination. *See Williams v. Anderson, supra* at 1086–1087. Once a prima facie case of discriminatory treatment is established, then the burden of proof shifts to the defendants. *See International Brotherhood of Teamsters v. United States, supra.*

On the basis of the record as a whole, this Court has found that the plaintiffs failed to establish a prima facie case of discrimination with respect to Class I, the class of employees allegedly discharged on the basis of race. While this Court did find that the absence control program was not always equally enforced as to blacks and whites and that race was a factor in the discharge of two employees, Alma Gipson and Wanda McKee, who were discharged for absences, these findings alone are not enough to establish a prima facie case. Moreover, since the claims of Gipson and McKee were dismissed with prejudice pursuant to a stipulation by the parties, the findings with respect to Gipson and McKee are relevant only insofar as they tend to establish a discriminatory motive on the part of Teletype.

The Court has further held that on the basis of the record as a whole, the plaintiffs established a prima facie case of discrimination with respect to Class II. However, Teletype satisfied its burden of proof of rebutting the prima facie case except with respect to promotions to grades 97 and 98, section and department chief. The record reveals that at the time Teletype's Little Rock plant opened, blacks were only. employed as janitors. At the time Title. VII was enacted in 1964, blacks were significantly underrepresented in the work force at Teletype. Moreover, this Court found that the failure of Teletype to employ more blacks was because of an intent on the part of Teletype to discriminate against blacks. This finding of an intent to discriminate is further supported by the failure of Teletype to adopt an affirmative action plan until 1970 and its failure to appoint and support an effective EEO coordinator at the Little Rock plant. The prima facie case is also supported by evidence that at the time of trial, black employees hired during 1971–1974 had not advanced as rapidly into grades above 95; and that during the same period, only four blacks were hired into grades above 93, while 47 whites were hired into grades above 93. The prima facie case is further supported by evidence that at the time of trial, no blacks had ever been managers, assistant managers and department

chiefs; only five, or 7.9% of the 63 section chiefs were black; no blacks were in grade 98; and only thirteen, or 11.3%, of 115 employees in grade 97 were black. The prima facie case is also supported by the finding that race was a factor in the demotion and failure to repromote Richard Davis to the position of section chief. The prima facie case is finally supported by the testimony showing that the absence control program was not always equally enforced with respect to blacks and whites.

As this Court found, Teletype did meet its burden of proof with respect to promotions to job classifications other than to grades 97 and 98, section and department chiefs. It principally sought to rebut the prima facie case of disparate treatment of blacks with respect to promotions to the above listed categories by arguing that it resulted from the operation of a bona fide seniority system which resulted in perpetuation of discrimination occurring before the effective date of Title VII, July 2, 1965. This Court cannot agree that the discrimination can be explained on the basis of the seniority provisions of the collective bargaining agreement or the seniority practices of the company. While seniority is a significant factor in the promotion of employees, it is not the controlling factor under the collective bargaining agreement, nor is it the only factor considered by Teletype with respect to promotion to management. See *International Brotherhood of Teamsters v. United States, supra.* Teletype also sought to rebut the prima facie case with statistics of black availability. Grades 97 and 98 are craft positions; and from the chart offered by the defendants and reprinted in finding of fact No. 22, it appears that Teletype has hired a lower percentage of blacks than are available in the relevant work force from 1970 to 1977. Section and department chiefs are managerial positions. The black availability for such positions is low; and from 1970–1977, Teletype had employed about the same percentage of black managers as were available in the relevant labor market. However, most black managers were promoted by Teletype in the later part of that time period, and blacks were only promoted into

the lower-level managerial positions. Thus, the statistics as to black availability do not rebut the prima facie case with respect to grades 97 and 98, section and department chiefs.

Finally, the defendants seek to meet their burden with the following statement made by Richard Davis in his deposition and introduced into evidence at trial:

Q. Outside of yourself, do you know of any black person that was entitled to a promotion that didn't get it?

A. No.

This statement alone cannot be given substantial weight. Davis was not in a position to know about the capabilities and qualifications of all of Teletype's 2,200 employees, many of whom worked on different shifts and in different sections and departments.

In summary, the plaintiffs have established a prima facie case of racial discrimination with respect to promotions to grades 97 and 98, and to section and department chiefs which the defendant has not rebutted.