Tommie W. TAYLOR and Larry C. Peyton, Plaintiffs,

v.

TELETYPE CORPORATION, Defendant,

James H. Bibbs, Ike Bolden, Virginia Burke, Bowman Burns, Jr., Fred Donley, Ray Jackson, Ray Kennard, Will Simmons, William Walker, James Walters, Jr., Cato Conley, Joseph Harris, Earl Jones, and Godfrey Hill, Intervenors.

No. LR–C–77–65.

United States District Court, E. D. Arkansas, W. D.

Aug. 29, 1979.

---

John T. Lavey, Little Rock, Ark., for plaintiffs.

Perlesta A. Hollingsworth, Little Rock, Ark., for intervenors.

James W. Moore and G. Ross Smith, Little Rock, Ark., for defendant.

## OPINION

ARNOLD, District Judge.

This is a Title VII case. The question is whether certain employees of the defendant Teletype Corporation, which is an employer engaged in interstate commerce, were demoted because they were black. The case was tried to the Court without a jury on July 24, 25, 26, 27, 30, and 31, and August 1, 2, 3, 6, 7, 8, 9, and 10.

## I. PRIMA FACIE CASE

Teletype Corporation makes teletype and other related machines for the long-distance transmission of data. Teletype operates two manufacturing plants, one in Little Rock, Arkansas, and one in Skokie, Illinois. The history of the Little Rock plant is set out in some detail in *Hoard v. Teletype Corp.*, 450 F.Supp. 1059 (E.D.Ark.1978), a case tried by the Hon. Gerald W. Heaney, Circuit Judge, sitting by designation. At the beginning of the trial in the instant case, plaintiffs and intervenors moved for a ruling that the findings and conclusions of the Court in *Hoard* be treated as *res judicata*. Defendant agreed to the motion, but only on condition that it include also those findings that were favorable to it. The motion was granted on this condition, so certain findings of the Court in *Hoard* may be set out here as part of the background of this opinion. In addition, there is ample support in the record of this trial for most of the findings about to be mentioned.

Teletype opened its plant in Little Rock in 1957. At that time the only blacks hired were janitors. The company deliberately followed a policy of racial discrimination. The company followed this policy because of its desire to avoid trouble, or what it thought would be trouble, by taking a public attitude too different from prevailing social customs at the time. It should be noted, in all fairness, that the company's conduct was not illegal in 1957. In 1960 Teletype Little Rock employed its first black in a position other than a janitor. By July 30, 1964, shortly after the passage of the Civil Rights Act which included Title VII, seven per cent of its employees were black. Race was a factor in this underrepresentation. In 1970, six years after the passage of the Act and two years after the issuance of an executive order applying to government contractors, of which Teletype was one, an affirmative action plan was developed for the first time. An equal employment opportunity coordinator was also appointed in that year, but the equal employment opportunity program at Teletype has not been signally successful. As the Court found in *Hoard*, "the EEO coordinators appointed by Teletype for the Little Rock facility were not properly trained or given adequate direction and support, and were unable to provide an effective affirmative action program." 450 F.Supp. at 1062. Until at least 1971, discrimination against blacks continued to hiring for all positions other than service, clerical, and the operative positions below grade 95. (Hourly-wage positions, most or all of which are held by employees covered by a collective-bargaining agreement, have been customarily referred to by two-digit numbers, beginning at 91, the lowest level, and continuing up to grade 98. Salaried employees, on the other hand, most of whom are not part of the bargaining unit, are referred to by three-digit numbers, beginning with grade 903 and continuing up to grade 910. There are numerous other refinements in the grading system at Teletype, some of which will be referred to later.)

After 1974, when the *Hoard* action was initiated, there was no discrimination in initial hiring, but between 1971 and 1974 the

company continued to discriminate in hiring for higher-grade professional and supervisory positions. Blacks were also discriminated against with respect to promotion to supervisory positions and bargaining-unit positions above grade 95. As the court held in *Hoard,* "the discrimination cannot be explained or justified by the seniority provisions of the collective-bargaining agreement or the seniority practices of the company," 450 F.Supp. at 1064, because "under the terms of the collective bargaining agreement, seniority is a factor but is not controlling in movement of employees within the bargaining unit. . . . [m]anagement retains final approval of movement within the production unit." *id.* at 1063. See also *id.* at 1068. The *Hoard* Court nevertheless absolved defendant of discrimination with respect to discharges and with respect to promotions into certain grades. Claims of discriminatory failure to promote were made in *Hoard* with respect to grades 96, 97, 98, TG (Trades Group) 1 and 2, 505 through 510 (the equivalent of 905 through 910), jobsetters and machinesetters, engineering associates (EA), UG (Ungraded—sometimes also referred to as ANSE, standing for Administrative Non-supervisory Employee) 1, 2, and 3, Section Chiefs, and Department Chiefs. Plaintiff's claim of discriminatory failure to promote was upheld only with respect to grades 97 and 98, Section Chief, and Department Chief. With regard to all of the other categories mentioned, the *Hoard* court held that the defendant had satisfied its burden of rebutting a prima facie case.

The instant case involves 16 individual claims, brought by the two original named plaintiffs and 14 intervenors, 13 of whom were permitted to intervene before trial, and one of whom was permitted to intervene after he testified at trial. In addition, on June 5, 1979, a class was certified to be represented by plaintiffs and intervenors, as follows:

Those black employees of the defendant who were demoted on or after February 28, 1974, including both bargaining-unit and non-bargaining-unit employees, and including those persons still employed by defendant and those employees no longer employed by defendant.

This opinion will address each of these claims in turn, but before doing so it is appropriate to add some details to the general history of black employment at Teletype—Little Rock already mentioned, and to address the question whether plaintiffs have made a *prima facie* case.

Both sides presented statistical evidence which the Court has found interesting and helpful. Dr. John Drane, defendant's statistician, presented a study of demotions between February 28, 1974, the beginning date for the certified class under this Court's order, and June 26, 1979. There were 1132 demotions during this time period, 301 of which involved blacks. There were 2,759 total employees during this time period, of whom 684 were black. The black representation in the work force was 24.79%, while black representation among employees demoted was 26.59%. The question, of course, is whether this deviation is statistically significant. In approaching this issue, statisticians use a concept known as the "standard deviation." This concept involves a comparison of the number of blacks actually demoted with the number that one would expect to be demoted if color were not operating as a factor. Here, since black representation was 24.79%, one would expect black demotions also to be 24.79%, unless color had some operative effect. Black demotions were larger, to be sure, but were they sufficiently larger to raise an inference?

Dr. Drane computed the "standard deviation" to be 1.403, and there is no dispute over the mathematical accuracy of his computation. In this situation, there is reason to believe that the differences are not statistically significant. The Supreme Court has had occasion to describe the "standard deviation" concept in a related context. In *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Court was dealing with a sample of 870 persons. "As a general rule for such large samples," the Court said, "if the difference between the expected value and the observed number is

greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Id.* at 496 n. 17, 97 S.Ct. at 1281. The same observation was repeated with approval in *Hazelwood School Dist. v. United States,* 433 U.S. 299, 309 n.14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Here, a standard deviation of 1.403 is well below the level mentioned by the Supreme Court, so Dr. Drane's evidence indicates, when considered alone, that actual black demotions did not deviate from expected black demotions sufficiently to ground a reasoned inference of discrimination.

On the other hand, Dr. Frank A. James, plaintiffs' statistician, presented studies that took a different point of view. He was not in significant disagreement with Dr. Drane with respect to the total time period covered by the class certified in this case, but Dr. James presented a more narrowly focused analysis of layoffs during the years 1974 through 1976. This case, of course, is about downgrades or demotions, not layoffs, but in a sense a layoff is the ultimate downgrade, and many of the layoffs that occurred at Teletype were the result of demotions of higher graded employees, employees who in turn "bumped" others, thus ultimately resulting in layoffs. Layoff statistics, therefore, may reasonably be considered a proxy for demotions for purposes of analysis. During the years 1974 through 1976, or, what is the same thing, during the years 1975 and 1976 (there were no layoffs in 1974), a total of 457 employees were laid off at Teletype—Little Rock. The greater number of the layoffs occurred in 1975, because that was a year of economic contraction which resulted in drastic reductions in the work force. Of the 457 persons laid off, 113, or 24.7%, were black, while 344, or 75.3%, were white. During this time period blacks constituted 20.4% of the work force. (This last percentage is taken from EEO Reports filed by Teletype and is somewhat imprecise, in that these reports included supervisory employees as well as others, while the layoff statistics analyzed by Dr. James included only non-supervisory employees. The number of supervisory employees, however, was relatively small, and it has not been shown that their inclusion significantly distorted Dr. James's computations.) The comparison between the number of blacks in the work force and the number of blacks actually laid off for this shorter time period yields a standard deviation of 2.28.

According to Dr. James, and his testimony is not disputed on this point, when the standard deviation is 2.28, the chance that only random factors produced the discrepancy is between one and two percent. To put it another way, a standard deviation of 2.28 enables a statistician to state, with a confidence level between 98 and 99, that some factor other than random selection was in operation. A difference of 2.28 falls right in the middle of the range referred to by the Supreme Court in *Hazelwood* and *Castaneda,* so those two cases do not appear dispositive one way or the other on this point. It should be noted, however, that the regulations of the Equal Employment Opportunity Commission, which are entitled to some deference from this Court, indicate that a 95-per cent level of confidence is statistically significant. This level of confidence is the mathematical equivalent of a standard deviation of 1.645. See 29 C.F.R. § 1607(5)(c)(1). *Cf.* the dissenting opinion of STEVENS, J., in *Hazelwood,* 433 U.S. at 318 n. 5, 97 S.Ct. 2736, indicating that a 95% level of confidence may be significant. This Court does not believe that this statistical evidence, in view of the rule of thumb announced by the Supreme Court in *Hazelwood* and *Castaneda,* would of itself be sufficient to make a *prima facie* case of discrimination. As to the time period 1974 through 1976, however, it certainly is entitled to consideration along with other factors, and may help to support a *prima facie* finding.

Other evidence indicates that Teletype was slow to develop an effective equal opportunity effort, even after the effective date of the Civil Rights Act of 1964. There was, for example, an apprentice training program that began in 1957. No blacks were accepted into the program until 1971.

From time to time in its affirmative action programs the company made various commitments, but its performance did not always live up to the commitments. The 1971 AAP, for example, recognized that blacks were under-utilized in the engineering associates category. Yet, as will be seen below when the individual claims are discussed, a black engineering associate was demoted in 1975 even though he had been ranked above 13 out of 31 engineering associates. Some white engineering associates ranked below him were not demoted at the same time. Blacks were particularly hard hit—"victimized" in the words of Lafayette Y. Morrison, Jr., defendant's black EEO coordinator at the Skokie plant—by demotions and layoffs in 1975, a time when the company was forced by business conditions to reduce its work force substantially. There were, for example, 1,764 employees at Teletype—Little Rock at the end of 1974. By the end of 1975, the number had decreased to 1,259 (PX 113). The percentage of blacks had also decreased. In other words, blacks were harder hit by the layoffs than whites were. Blacks had come to the work force late and therefore tended to be disfavored when the time came to pare down the payroll.

As noted by the court in *Hoard*, and as is evident from a reading of Article 28 of the Collective-Bargaining Agreement (PX 110), seniority was a factor in personnel decisions, but it was not the controlling factor in every case, at least so far as the contract itself is concerned. (The contract, of course, relates only to bargaining-unit employees.) Other factors, less susceptible of objective measurement, were important, such as competence and experience, these factors to be applied in the discretion and judgment of company management. The same can be said with regard to non-bargaining-unit employees. Those to be laid off, according to a policy guide dated March 21, 1975, would be determined in accordance with their ability, performance, potentiality, term of employment, and the needs of the business. The application of these factors necessarily involved the exercise of a substantial degree of subjective judgment. "Term of employment" was only one factor among several to be considered.

Mrs. Marianne Eastin, a Section Chief in the Personnel Department, testified that affirmative-action goals could not be considered during a time of economic contraction. Seniority only had to be the criterion in that event, she said. This testimony is at variance with the terms of the collective-bargaining contract. Section 3 of Article 28 governs movement of personnel when lack of work necessitates decreasing the work force. Under Section 3.1, for example, the company has the right to exempt from layoff certain employees "when such exemptions are necessary to avoid unreasonable departmental depletions," and may also exempt from declaration as surplus those employees "whose skill, training, or experience is necessary for the efficient operation of the business." Company officials testified that such exemptions seldom occurred, and there is no doubt that seniority was one of the most important single considerations looked to in determining whom to demote and where to put employees who had been demoted. The fact remains, however, that seniority was not controlling. The company was at liberty to consider other less easily measurable factors, and this fact must be taken into account when considering possible explanations for the disproportionate adverse impact on blacks of the 1975 reduction in force.

This reasoning applies *a fortiori* to non-bargaining-unit employees. According to Teletype's "Rules for Reduction of Salaried Force" dated June 19, 1975 (PX–51), all salaried employees were to be "rank ordered by department or function and bumped based on rank order . . . ." The rank ordering itself, necessarily, represented the judgment of supervisory employees based on a number of criteria.[1] Among those taken into account for this purpose were performance on the job, conduct, at-

---

1. Furthermore, it was not always followed, as we shall see when the individual claim of Larry Peyton is discussed.

tendance, the value of the job to the department, and the ability of the employee to get along with others. The extent to which a certain employee's duties could be dispersed among other employees was also material. In addition, it is a management decision to determine in the first place how many employees should be declared surplus, a decision that obviously influences the degree of adverse effect felt by lower-ranking employees, more of whom, proportionally, were black. This management decision apparently was made without reference to affirmative-action goals. Most of the decisions with respect to the precise effect of reductions in force, moreover, were made by white supervisory and salaried employees. There were only a few black placement analysts, and during most of the relevant period Mrs. Tommie Taylor, one of the named plaintiffs herein, was the only black employee in the Personnel Department. There is no requirement of law, that blacks must be involved in personnel decisions affecting other blacks, but when black employees, at least on the face of it, appear to bear the brunt of economic downturns, and when whites are the only ones, or almost the only ones, determining the impact on the work force of such downturns, the impartiality of the entire process can fairly be drawn in question.

■ To summarize, the company has a proved history of discrimination on the basis of race extending in some respects up to as late as 1974. In times of economic downturn, blacks, latecomers that they were, suffered more severely. No effective affirmative-action program at Little Rock was mounted. The Court does not wish to be understood as minimizing the efforts that Teletype did make. The company began informal affirmative-action efforts in 1961, substantially in advance of the Civil Rights Act. There is no showing that the disparate impact of layoffs and demotions in 1975 was the result of a conscious effort to harm blacks as such. The fact remains, however, that blacks were harmed more than whites, and this harm cannot be ascribed entirely to the operation of a bona fide seniority system that had only the effect of perpetuating pre-Act discrimination. Here, a substantial amount of discrimination was still continuing as long as ten years after the Act was passed. Considering all these factors, the Court finds that the plaintiffs have made a *prima facie* case with respect to black employees demoted between February 28, 1974, and the end of 1976. No such *prima facie* case has been made with respect to demotions in 1977, 1978, and 1979. With regard to these last three years, the Court accepts defendant's statistical evidence.

In making this finding that plaintiffs have partially sustained their burden of making a *prima facie* case of racial discrimination, the Court is mindful of the Supreme Court's recent opinion in *United Steelworkers of America v. Weber*, —— U.S. ——, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). The Supreme Court referred in particular to the remarks of Senator Clark during debate on the bill that included what was to become Title VII: high unemployment among blacks " 'is a social malaise and a social situation which we should not tolerate. That is one of the principal reasons why this bill should pass.' " At ——, 99 S.Ct. at 2727, quoting 110 Cong.Rec. 7220 (1964). Yet, 15 years after the passage of the Act, the problem is still with us. Last year black unemployment was 129% higher than white unemployment. At —— n. 4, 99 S.Ct. 2721. Title VII may properly be construed with the purpose of Congress to redress that inequity in mind. It may be easier for defendant to rebut this *prima facie* case with respect to bargaining-unit employees, especially those in lower grades, because the importance of seniority as an objective factor was greater at that level, but the Court is nevertheless persuaded that a *prima facie* case has been made, both with respect to bargaining-unit and non-bargaining-unit employees, for the years 1974, 1975, and 1976.

## II. THE INDIVIDUAL CLAIMS

■ Sixteen individual claims are before the Court. No proof was presented at

trial with respect to the intervenors Ike Bolden, Will Simmons, James Walters, Jr., and Ray Jackson. Defendant's motion to dismiss with respect to these four, which their counsel did not oppose, was granted in open court. In addition, defendant points out that intervenors Fred Donley and Ray Kennard were not demoted after February 28, 1974, and are therefore not members of the class which the Court has certified. These parties might have had a claim for pre-1974 discriminatory demotion, but it would have to be an individual claim, and the Court lacks jurisdiction to decide it, because neither Mr. Donley nor Mr. Kennard ever filed a charge before the EEOC. 42 U.S.C. § 2000e–5(f)(1). The Donley and Kennard claims are therefore also dismissed with prejudice.[2]

### A. Tommie W. Taylor

■ The plaintiff Tommie W. Taylor was first employed by the defendant Teletype Corporation on January 2, 1962. She was employed as a clerical in grade 903, a salaried position not covered by any collective-bargaining agreement. Mrs. Taylor was the first black clerical employee hired by Teletype at its plant in Little Rock. Her employment was primarily due to the efforts of Frederick DeWolfe Walker, Chief Executive Officer of the Little Rock plant at the time. Mr. Walker had been commendably active at an early date in promoting opportunities for black applicants and employees and had identified himself with groups such as the Urban League that were actively engaged in promoting equal opportunity at a time when such efforts were far less acceptable in the Little Rock area than they are today. Mrs. Taylor rose through the ranks of clerical employees and eventually, on March 1, 1969, became a grade 906 in the reproduction section, a group of employees whose responsibility it is to copy plans and other documents for use in the plant. The reproduction section was attached to the Personnel Department. On August 1, 1970, Mrs. Taylor was again promoted, this time to a grade 908, and in time she became the lead person in reproduction.

One of the machines in the reproduction area was called a "Bruning" machine, and this machine used ammonia in some way to reproduce large drawings. Mrs. Taylor had difficulty with the ammonia, and Teletype's Medical Department recognized the difficulty by issuing to her on January 26, 1967, a form entitled "Notice of Employee's Work Restrictions and Temporary Work Classification" (PX–13). This form, signed by Louise Ferguson, Registered Nurse, specified that Mrs. Taylor was not to be exposed to ammonia gas fumes. This work restriction, which was temporary when issued, became permanent on March 12, 1969 (PX–15), at which time a new form specified that Mrs. Taylor was not to be exposed to "sys-

---

2. On August 20, 1979, in their response to defendant's motion to dismiss these claims, intervenors asked that this Court's order certifying a class be amended to extend back until December 3, 1971 (the beginning date of the promotion class in *Hoard*), instead of February 28, 1974. This request is denied. The class was certified by Order dated June 5, 1979. The trial was completed on August 10, 1979. It would not be fair to the defendant to expand the class at this late date to include the many black persons presumably demoted between December 3, 1971, and February 28, 1974. It is not simply a matter of considering two additional individual claims. Post-judgment determination of a class, or post-judgment modification of a class previously determined, must be the exception rather than the rule. *Cf. Marshall v. Kirkland*, 602 F.2d 1282 at 1301 (8th Cir. 1979).

Nor would these claims fare any better under 42 U.S.C. § 1981, which intervenors also pleaded by reference to the original complaint. Assuming that a 1981 claim would not be time-barred by the Arkansas three-year statute of limitations, Messrs. Donley and Kennard have not sustained the burden of showing purposeful discrimination, which is an element of a 1981 claim, as distinguished from Title VII. See *Marshall v. Kirkland, supra*, at 1298–1299. Mr. Kennard's demotion was part of a good-faith reduction in force and did not violate the collective-bargaining agreement. Mr. Donley's demotion may have been in violation of the agreement; he claims that the man who "bumped" him had had no previous experience as a plater. He had, however, had experience as a heat treater, a job in the same department, and he had been a supervisor of platers. The company treated that experience as sufficient, and this Court is unable to say that this judgment was infected by conscious racial motives.

temic poisons." The form was simply an internal communication within the company to inform all employees who needed to know that Mrs. Taylor was not to be exposed to ammonia.

On July 1, 1971, again primarily because of the continued interest of Mr. Walker, Mrs. Taylor was promoted to Civic Relations Assistant, a job in the category referred to as either "U.G. 1" (U.G. stands for Ungraded) or ANSE 1 (ANSE stands for Administrative Non-Supervisory Employee). As Civic Relations Assistant, Mrs. Taylor was given responsibilities substantially different from the clerical duties she had previously performed. She was moved out of the reproduction area and into the Personnel Department proper. Mr. Walker's decision to promote her to this job probably stemmed from concerns that had been expressed to the company by black community leaders in Little Rock. In 1971, primarily because of worsening economic conditions, massive downgrades and layoffs had occurred at the Little Rock plant, and black employees, who on the whole came to Teletype later than many whites, were hard hit. It was thought that the assignment of Mrs. Taylor, who is black, to a civic relations position would begin to improve communication with the black community. Mrs. Taylor's duties as Civic Relations Assistant fell primarily into two categories: representing the company at meetings of black organizations, and assisting in the preparation of affirmative action plans, which the company was required to produce and sign yearly as part of its obligation as a government contractor. Mrs. Taylor did not initially do much of the writing of these plans, but she did have increasing exposure to the process of plan preparation.

On June 18, 1973, Mrs. Taylor was again promoted, this time to Industrial Relations Associate, an ANSE 2, or U.G. 2, position. Her duties at first were substantially the same as before, except that she was expected to operate with less supervision. In early 1975 Joe Garrison, Department Chief of the Personnel Department, assigned Mrs. Taylor the job of preparing the 1975 Affirmative Action Plan (commonly referred to as the AAP) from start to finish. Mrs. Taylor was to prepare a complete draft of the plan and give it to Mr. Garrison for his review in final form. (There is a sharp conflict of testimony about this, but the Court believes Mr. Garrison.) Problems began to crop up at once. When Mrs. Taylor submitted to Mr. Garrison a portion of the 1975 AAP (PX–58), he noticed some deficiencies. Many of these deficiencies were minor, but some of them were not. Some of the statistical information that the Plan was supposed to include, for example, was not correct, and Mrs. Taylor apparently did not clearly understand how to compute ratios of certain groups of employees. On February 19, 1975, Mr. Garrison reviewed these problems with her and expressed doubts as to whether she could handle the job of writing an AAP. In a memorandum of this conversation dated February 20, 1975, Mr. Garrison observed that "it is possible that Mrs. Taylor would be better suited for civic relations or the reproduction area." Mrs. Taylor, Mr. Garrison, and others working together then completed the AAP for 1975. (In this connection, the Court thinks it significant that Mrs. Taylor's calendar for the year 1975, which is in evidence as DX–4, contains the notation "complete AAP" under date of February 5. This exhibit, which is apparently in Mrs. Taylor's own handwriting, strongly indicates that she had primary responsibility in 1975 for AAP preparation).

On March 20, 1975, Mrs. Taylor asked Mr. Garrison, who was her immediate supervisor, to be allowed to take Monday, March 24, as a day of vacation. Mr. Garrison declined the request. It was his opinion that Mrs. Taylor should plan to work on that Monday because March 31 was the due date for the AAP. Mrs. Taylor agreed to report to work on Monday the 24th. On that morning, however, she called in with a "tension headache." She spoke with Mrs. Marianne Eastin, a Section Chief in the Personnel Department. Mr. Garrison was not in when Mrs. Taylor called. Mrs. Taylor told Mrs. Eastin that she and Mr. Garrison had discussed Mrs. Taylor's taking a

day's vacation on Monday, March 24, but she did not tell Mrs. Eastin that Mr. Garrison had declined to approve this request. Mrs. Eastin, who was not operating with full knowledge of the facts, suggested that Mrs. Taylor simply take a day's vacation on that Monday, and she did so. When Mrs. Taylor returned to work the following day, Mr. Garrison reprimanded her for the absence and stated that in his opinion she had not assumed her full responsibility in the completion of the 1975 AAP. "In my judgment," Mr. Garrison wrote, "the 1975 AAP would not have been completed on schedule if it had been left entirely to Mrs. Taylor" (PX–46).

Finally, on April 24, 1975, Mr. Garrison informed Mrs. Taylor that she was being downgraded from ANSE 2 to Grade 910, with the new title of Public Relations Representative. The decision to downgrade Mrs. Taylor was made by Mr. Garrison, Mrs. Eastin, and M. E. Seamon, an Assistant Manager. There were three reasons for the demotion: Poor job performance in connection with the drafting of the 1975 AAP; the incident of Monday, March 24, the day of Mrs. Taylor's unauthorized absence; and a general expectation that economic conditions were worsening and that layoffs and demotions would be required plant-wide. The Court finds that these were indeed the reasons for the demotion, and that the company has rebutted plaintiff's *prima facie* case with respect to this downgrade. The reasons were not merely pretextual, and the downgrade was not based on Mrs. Taylor's race, in whole or in part. It should be noted, in addition, that the financial consequences of the downgrade to Mrs. Taylor were not great. Her salary as an ANSE 2 immediately before the downgrade was $1,050.00 a month. After the downgrade, she began receiving $1,005.00 a month in her new position at Grade 910, but this $45.00 per month reduction lasted only until July 1, 1975, at which time she received a salary increase to $1,076.00 per month.

Mrs. Taylor then began work in her new, downgraded, position as a 910. In this position her duties were primarily in the reproduction area. She was supposed to continue civic-relations functions, for example attending meetings of groups interested in equal opportunity, but in fact very little of this kind of work was done after April 24, at least in part because her superiors in the company refused to give her permission to leave the plant for this purpose. Some time in August, while Mrs. Taylor was absent because of surgery, it was decided to downgrade her again, this time to a 906. The downgrade was scheduled for September 1, 1975, but was delayed until Mrs. Taylor returned from work after her sickness (PX–53).

When she did return, on September 22, 1975, she went first to the Medical Department, which was customary practice for employees returning after an illness. Ms. Ferguson gave Mrs. Taylor another form indicating a permanent restriction to exposure to systemic poisons, including ammonia (PX–54). Since Mrs. Taylor had been working in the reproduction area since her first downgrade, there had been some discussion about requiring her to work on the Bruning machine, and the work restriction issued on September 22 simply reaffirmed that Mrs. Taylor was not to be required to do this work. She then made her way back to the Personnel Department, where Mrs. Eastin informed her of the second downgrade. Mrs. Eastin told her that she was to do the "full tour of duty," including running the Bruning machine. It was not fair to the other employees, Mrs. Eastin said, for Mrs. Taylor not to perform the full range of duties. Mrs. Eastin told her that if she could not perform these duties, another job would have to be looked for, and if none was available, she would be laid off. Mrs. Taylor went back to the reproduction area and worked on the Bruning machine, but exposure to the ammonia made her ill. The same thing occurred each day of that week, and finally, on September 26, 1975, Mrs. Taylor elected to be laid off instead of remaining as a Grade 906 clerk. The company form, PX–57, indicating the layoff contains the following notation: "rehire consideration: consult Personnel Department prior to consideration for re-employment."

There was a reduction in force taking place at about this time, and economic contractions of this kind can of course furnish a legitimate and nondiscriminatory reason for demotions or layoffs. In this instance, however, the Court does not believe that the defendant has articulated such a reason with sufficient clarity. There are too many inconsistencies in the explanations offered to be convincing. Mrs. Taylor had worked in reproduction for a number of years before her promotion in 1971. During the last four of those years, she had been subject to the work restriction with respect to the Bruning machine. There was no complaint whatever about her performance at that time. She was uniformly reported to be an excellent employee. Apparently the company found no difficulty in accommodating itself to her inability to use the Bruning machine. When Mr. Garrison demoted her from ANSE 2 to 910 in April, he did not intend that she be required to work around the Bruning machine. (Mr. Garrison left the Personnel Department on September 1, 1975, and was apparently not involved in the decision to demote Mrs. Taylor from 910 to 906). It is suggested that the number of employees in the reproduction area was significantly less in 1975 than it had been previously, and that therefore the company could not afford to have an employee who was unable to perform the full range of duties. This suggestion cannot withstand analysis. Just before Mrs. Taylor was promoted out of the reproduction area in 1971, she and two other employees were the only ones in reproduction on a permanent basis. At that time she was the lead person in reproduction, and the machines were operated efficiently without her having to come in direct contact with the Bruning machine. In addition, when Mrs. Eastin and Mrs. Taylor conferred with Mr. Seamon the last week of Mrs. Taylor's employment about this problem, Mr. Seamon several times expressed the opinion that there would be enough work in the reproduction area to occupy Mrs. Taylor without compelling her to use the Bruning machine personally, a suggestion rejected by Mrs. Eastin. In short, Mrs. Taylor was forced out of the company. She had no real choice except to accept a layoff. Her conceded health problems prevented her from accepting the second demotion to a Grade 906, because this position would have required her to work with the Bruning machine. A company is not required by the Civil Rights Act or any other enactment, of course, to continue employing a person who is physically unable to do the job. But the company had employed Mrs. Taylor in this job for a long period of years with full knowledge of her health problem, which was a genuine one and is not in dispute. The Court therefore finds that the company has not successfully rebutted the prima facie case of racial discrimination with respect to Mrs. Taylor's second demotion and subsequent layoff.

## B. Larry C. Peyton

■ Larry C. Peyton first came to work at Teletype on December 16, 1968. He was made an engineering associate, an ungraded job not in the bargaining unit, on May 14, 1973. He was part of the commercial-inspection section of the Engineering Department. His duties were primarily electronic, rather than mechanical, in nature, and he was uniformly regarded as a good employee. There were no complaints about either the quality or the quantity of Mr. Peyton's work.

During the first part of May, 1975, Glenn Paul Steubenrauch, Assistant Manager for Manufacturing and Engineering, passed on a direction that all engineering associates be rank ordered. The company knew that an economic contraction was in the offing, and one of the purposes of making the rank order was to enable management to make rational decisions when the time came about who should be laid off or demoted. Mr. Steubenrauch's direction went to, among others, James Moore Eldredge, one of six department chiefs under Mr. Steubenrauch's jurisdiction. Mr. Eldredge prepared a rank order of five engineering associates under his supervision. Intervenor was ranked fourth out of the five. The factors used by Mr. Eldredge included technical ability, flexibility in adapting to assignments, and cost-reduction efforts. Mr.

Eldredge then met with five other supervisors and came up with a combined rank order covering all 31 E.A.'s. Mr. Peyton was ranked eighteenth out of the 31.

Shortly thereafter Mr. Steubenrauch asked Mr. Eldredge and the other supervisors in engineering to select one employee who could be dispensed with if the necessity for demotions or layoffs came about. This request was made in June or July, and Mr. Eldredge reported that Mr. Peyton would be the person to lay off or demote if someone had to be selected. Four persons, three of them white, were then downgraded on July 28, 1975. Mr. Peyton was demoted to T.G. (Trades Group) 2, a job that initially paid no less than he had earned as an E.A., but that involves significantly less fringe benefits, prestige, and opportunity for future advancement. Some of the other persons ranked below Mr. Peyton, all 13 of whom were white, were not demoted at this time. Mr. Peyton's demotion left only one black among the company's remaining 27 E.A.'s.

These circumstances, particularly the demotion of a black employee who was ranked so high so recently, raise a strong inference of racial discrimination. Reasons given by the company for selecting Mr. Peyton for demotion are not sufficient to rebut this inference. It is true that R. V. Tucker, who was ranked twentieth, was doing especially important work at the time. He was drafting instructions for other employees to use in inspecting outside cabinetry designed for the company's new Model 40 machine. Mr. Peyton had no intensive experience in such work. He did however, have some familiarity with the Model 40 machine, including its outside cabinetry, and he could have learned to do the same job that Mr. Tucker had been doing, and to do it well, in about one month. (Tucker, incidentally, had been ranked fifth out of five in Mr. Eldredge's rank ordering of E.A.'s under his direct supervision.) In addition, a thirty-second E.A., R. H. Zieman, who was white, was not even considered for demotion. As Mr. Steubenrauch testified, Mr. Zieman had been with the company thirty-five years and had recently been downgraded from

Section Chief, but the fact remains that the company's preferment of Mr. Zieman over Mr. Peyton was a direct violation of Section 2.12(a) of a T.I. (Teletype Instruction) dated March 21, 1975 (PX–45) setting out procedures to be followed in selecting E.A.'s for demotion or layoff. Under this written policy, E.A.'s rated outstanding or good should replace those merely satisfactory "or not appraised." Mr. Zieman was not assessed when the rank order of the other 31 E.A.'s was compiled. See DX–1. The Court concludes that Mr. Peyton's demotion on July 28, 1975, was based at least in part on his race.

### C. James H. Bibbs

James H. Bibbs was first employed by the company on October 14, 1968. On March 31, 1975, he was downgraded from a 94 Stockkeeper to a 93 Stock Selector. Two white employees with less seniority were left at Grade 94. This difference in treatment has not been explained. Mr. Bibbs's work record had been satisfactory. The Court therefore finds that his demotion was based at least in part on race.

### D. Virginia S. Burke

Virginia Smith Burke was first employed by the company on October 31, 1966. On September 1, 1975, she was downgraded from a 908 Accuracy Checker in the Engineering Department to a Grade 94 Inspector in the bargaining unit. She was the only black employee in her part of the Engineering Department out of a total of 15. Her place was taken by Felix Cieselski, who had been demoted from Engineering Associate. Mr. Cieselski was white. Ms. Burke was the first black Accuracy Checker, and no black has been an Accuracy Checker since her demotion.

Ms. Burke's supervisor was Joe Sullivan. He had 31 employees under his supervision, including some in the Accounting Section and some in the Industrial Engineering Section. Ms. Burke was in the latter section. Out of Mr. Sullivan's 31 employees, two were black, and both of them were downgraded on or about September 1, 1975.

Four out of the 15 employees in Industrial Engineering were downgraded or laid off. These four were the lowest on a rank order that had been prepared under Mr. Sullivan's supervision. The purpose of the rank order was to assist the company in making decisions made necessary by a slackening of demand. The criteria used were performance, skill, and value to the department, considering both the individual and the job held. Ms. Burke was ranked thirteenth out of 15 on the rank order, which was prepared on June 24, 1975 (DX–32). The other persons among the four lowest employees were Ollie Quire, a 905 Clerk, who was white, ranked fifteenth, L. M. Kersey, a white Engineering Associate, ranked fourteenth, and Joe Favor, a white Engineer, ranked twelfth. Quire was downgraded to a 904 in Reproduction. Kersey and Favor were laid off.

The Court finds that the company has rebutted the *prima facie* case with respect to Ms. Burke's demotion. The rank order was prepared in good faith and without regard to racial considerations. The four employees demoted or laid off in Industrial Engineering were the last four persons on the rank order, and three of these four were white. The issue is not without its difficulties, but on balance the Court holds that Ms. Burke's demotion was not unlawful.

### E. Bowman M. Burns, Jr.

■ Bowman Matthew Burns, Jr., was first employed by the company on February 21, 1966. On April 10, 1978, he was downgraded from a 97 in Screw Machine to a 96 in Drill Press.

The date of Mr. Burns's downgrade takes him out of the time period with respect to which the Court has found a *prima facie* case of discrimination. Even if he had the benefit of this finding, however, the downgrade would not be unlawful, because Mr. Burns's own testimony shows that it was not based on race. Both whites and blacks were affected at the time, and some of the whites demoted had more seniority than · Mr. Burns. In addition, Mr. Burns testified that he was not complaining about the 1978

downgrade. (He had also been downgraded on April 12, 1971, from a 96 to a 94, but the record is devoid of any evidence concerning the circumstances of this demotion.) Finally, the effects of the 1978 demotion were dissipated, for legal purposes, on August 30, 1978, when Mr. Burns was offered promotion to a Grade 97 but declined because he did not wish to return to that grade at that time. DX–34. The Court therefore holds that no illegal conduct occurred with respect to Mr. Burns.

### F. Cato Conley, Jr.

Cato Conley, Jr., began with the company on June 24, 1963 as a Grade 93 Janitor. He was promoted several times, until, on March 31, 1975, he was downgraded from a Grade 97 Screw Machine Operator to a Grade 96 Utility Person in the Screw-Machine Section. The company has satisfactorily explained this demotion. Three or four Grade 97 Screw Machine Operators were demoted at the same time, all of whom, except Mr. Conley, were white, and all of whom became Grade 96 and stayed in the Screw-Machine Section. These demotions occurred because of a business slowdown and were carried out based on seniority. Later, Mr. Conley was offered promotion back to Grade 97, but he declined. The Court finds that Mr. Conley's demotion in 1975 was not unlawful.

### G. Joseph Harris

■ Joseph Timothy Harris first came with the company as a Grade 91 on December 5, 1966. He was promoted several times, and on July 1, 1973, became a salaried Grade 908 Stock Analyst, also known as a Results Investigator. On February 19, 1975, he was downgraded to a Grade 95 Layout Operator. On March 31, 1975, he was again downgraded to a Grade 94 in the Wire Department. Mr. Harris was also downgraded on November 7, 1977, but no issue as to the legality of this demotion is presented. The question is whether the 1975 demotions were based, in whole or in part, on the fact that Mr. Harris is black.

The defendant has satisfactorily explained the February 19, 1975, downgrade from 908 to 95. Henry Taylor Smith, who

was Mr. Harris's supervisor at the time, made a rank order of his employees. Mr. Harris was second from the bottom. The low three employees, two of whom were black and one of whom was white, were all demoted to Grade 95. Mr. Harris's performance in the 908 job had been spotty at best. Contemporaneous memoranda dated January 31, 1974, and February 20, 1974 (DX–37 and DX–38), show substantial problems with Mr. Harris's performance. When he was again evaluated on December 23, 1974, he was found to be performing satisfactorily (DX–39), but Mr. Smith was entitled to consider the earlier problems in evaluating Mr. Harris for rank-order purposes, and he did so. The demotion of February 19, 1975, was not unlawful.

No similar showing has been made, however, with respect to the March 31, 1975, demotion from Grade 95 to Grade 94. There is no substantial evidence in the record explaining this downgrade. The Court therefore finds that it was unlawful.

### H. Earl Jones

Earl Jones was first employed by Teletype on December 13, 1965 as a Grade 91. He was promoted several times, reaching the position of a Grade 96 Automatic Screw-Machine Operator. On March 31, 1975, he was downgraded to a 95 in Drill Press. One other person in Drill Press, Bill Reddick, who was white, remained at a Grade 96, even though he had less seniority than Mr. Jones. Intervenor claims that he should have been "lateraled" to Drill Press as a 96, displacing Mr. Reddick. The company's clear practices, however, as described in detail by Mrs. Eastin, explain why this action was not taken. Mr. Jones had been in Drill Press, but only as a Grade 94 Drill-Press Operator. Mr. Reddick, on the other hand, was a Grade 96 Machine Setter, and Mr. Jones had not previously been a Machine Setter. The company has satisfactorily rebutted Mr. Jones's case, and the Court finds that his demotion was not unlawful.

### I. William James Walker

William James Walker was first employed by the company on October 31, 1966, as a Grade 91. He has been demoted four times, on March 8, 1971, on April 3, 1972, on March 31, 1975, and on November 11, 1977. Mr. Walker stated explicitly that he had no complaints about the 1971 or 1975 downgrades. The circumstances of the 1972 downgrade were not explained, and Mr. Walker's claim with respect to it, if in fact he is making such a claim, must be rejected, since this demotion is not within the time period covered by the Court's finding of a *prima facie* case, and Mr. Walker's proof, considered individually, does not in itself make such a case.

There is a good deal of evidence pertaining to the November 7, 1977, downgrade. On this occasion Mr. Walker was demoted from a Grade 96 Machine Setter to a Grade 95 Punch-Press Operator. Intervenor claims that H. M. Koon, a white man, who was also a Grade 96 Machine Setter, should have been demoted instead of him, and there is some support in the record for this view. Mr. Walker had been a Machine Setter slightly longer than Mr. Koon, and they both had the same effective starting date of service with the company. The company's subsequent conduct with respect to Mr. Walker, however, demonstrates to the Court's satisfaction that his demotion was not based on race. On November 16, 1977, nine days after the demotion, he was temporarily upgraded again to his previous Grade 96, and when this temporary upgrade expired on January 2, 1978, Mr. Walker returned to the 95 level for only one week. He was permanently upgraded to Grade 96 on January 9, 1978. The 1977 demotion, of course, falls outside the *prima facie* case that the Court has found established by the evidence. Even if it were within the relevant time period, the defendant's evidence would be a sufficient rebuttal. It is most unlikely that the company would have upgraded Mr. Walker again so promptly if it had been motivated by the fact that he was black. He was at the 95 level because of the demotion for only 16 calendar days. The Court therefore finds that this demotion was not unlawful. It was part of a lawful reduction in force occasioned by lack

of work and carried out without regard to race.

### J. Godfrey Hill

 Godfrey Hill began with the company on September 29, 1976, as a Grade 91 Assembly Worker. He rose to a Grade 93 in Drill Press. He testified that in September 1978 he was demoted to a Grade 92. In 1979 Mr. Hill was terminated for excessive absences.

Mr. Hill's claim falls outside the time period covered by the *prima facie* case that plaintiffs have established. Nor could he make a *prima facie* case on an individual basis, because, as his work record, shortly to be discussed, shows, he was not qualified to work for Teletype. The Court finds that his demotion was not based, in whole or in part, on his race. Mr. Hill testified that some white employees with less seniority were not demoted, but no names of employees were mentioned, and the Court does not credit this testimony. Mr. Hill had an extensive record of documentations for performance and attendance problems during his tenure at Teletype. A total of 21 contemporaneous memoranda of such problems are before the Court as DX–50. On October 12, 1978, for example, while Mr. Hill was still a Grade 93 (apparently his testimony as to the date of his demotion was incorrect), Mr. Hill was told that his efficiency was unsatisfactory and that it would have to be improved or disciplinary action would be taken. On October 23, 1978, when Mr. Hill was a Grade 91 (apparently having been demoted two grades since October 12), he was again "written up" for poor attendance.

### III. FURTHER PROCEEDINGS

In summary, the Court finds that there is a *prima facie* case of discrimination against the class on grounds of race in violation of Title VII during the years 1974, 1975, and 1976, and that defendant discriminated with regard to the second demotion and subsequent layoff of Mrs. Taylor, and with regard to the demotions of Messrs. Peyton, Bibbs, and Harris (March 31, 1975 demotion). The other claims will be dismissed with prejudice.

These findings of fact and conclusions of law dispose of the liability issues with regard to the plaintiffs and intervenors. The questions of relief and of liability to class members demoted during the years 1974, 1975, and 1976 remain. The Court would like submissions from the parties covering the following questions, together with any other issue the parties believe should be addressed:

(1) With regard to the class:

(a) What type of notice under Fed.R. Civ.P. 23(d)(2) of the right to file a claim should be given to class members? How should it be worded, what time limits for the making of claims should be imposed, and which party should pay for the notice?

(b) Should the Court grant injunctive relief in view of its finding that the defendant did not discriminate with regard to demotions after 1976? If such relief is appropriate, what should be its scope? Should the defendant be required to institute more objective criteria for the exercise of its discretion in the demotion of employees?

(2) With regard to the individual plaintiffs and intervenors whose claims were found to be meritorious, what relief is appropriate for each of them?

(a) What amount of back pay will fairly compensate Mrs. Taylor and Messrs. Peyton, Bibbs, and Harris?

(b) Should Mrs. Taylor be reinstated and, if so, to what position? Does she come into this court of equity with clean hands, in view of the Court's finding adverse to her on a key question of credibility?

(c) Should those demoted from bargaining-unit positions be immediately reinstated to the positions from which they were demoted, or should they be declared eligible to bid, under the company's seniority system, on the next job opening in that category? Should Mr. Peyton be immediately reinstated to the position from which he was demoted, or should he be granted the next opening in that cate-

gory? What effect will the resolution of these questions have on back pay?

(3) What further equitable relief, if any, would be appropriate at this stage of the proceeding?

Plaintiffs and intervenors should file their memoranda on or before September 14, 1979, and the defendant should reply by October 1, 1979.

IT IS SO ORDERED this 29th day of August, 1979.