NORTH CAROLINA DEPARTMENT OF CORRECTION v. EARL GIBSON

No. 8110SC582

(Filed 20 July 1982)

1. State § 12— termination of State employee for racial reasons—use of Title VII evidentiary standards proper

Given the similarity between the language of G.S. 143-422.2 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(3) *et seq.* and the underlying policy of the statutes, it was reasonable for the Personnel Commission to use Title VII standards in a case in which a State employee had reason to believe that his employment was terminated because of his race. G.S. 126-36.

2. State § 12— dismissed State employee—burden of establishing prima facie case of discrimination

In an individual discrimination case, the burden of establishing a *prima facie* case of disparate treatment is not onerous. Therefore, where a State employee showed that he was black, that he was discharged from his job, that he was qualified for his job and that three white employees who also failed to make the mandatory supervisory check in a prison were retained while he was dismissed for failing to make supervisory checks, he established a *prima facie* case of racial discrimination in his dismissal.

3. State § 12— discrimination in State employment—employer's burden of production

Where a State employee alleged discrimination as the basis of his termination and presented a *prima facie* case, the Department of Correction sufficiently rebutted the presumption by introducing admissible evidence concerning the reasons for the employee's termination.

4. State § 12— State employee's termination—burden of showing reasons for discharge were pretext for discrimination

In a Title VII case, once the employee carries the initial burden of establishing a *prima facie* case of racial discrimination and the employer has articulated some legitimate, non-discriminatory reason for the employee's rejection, then the employee must prove that the employer's stated reasons for termination were in fact a pretext for racial discrimination. A black prison employee, who was discharged after failing to make several "flesh" checks of each inmate in a segregation area of a prison and failing to discover an escape of two inmates, met this burden when he showed (1) a conflict in the reasons given by the prison superintendent for his dismissal, (2) 119 inmates had escaped prior to the incident involving this employee without any employees being dismissed, and (3) four white employees testified that they were not certain they always "counted flesh" on their hourly check and also failed to discover the missing prisoners.

5. State § 12— termination of prison employee—superior court review of Personnel Commission's findings and conclusions—error to reverse

In an action in which a prison employee alleged racial discrimination as the basis of his discharge from employment, the superior court erred in re-

versing the State Personnel Commission's order finding that the employee should be reinstated where the Commission's findings of fact and conclusions of law were not arbitrary or capricious, they were not made upon unlawful procedures, they were supported by competent, material and substantial evidence when viewed on the record as a whole and where they were conclusive on the reviewing court.

Judge HEDRICK dissents.

APPEAL by respondent from *Godwin, Judge.* Order entered 28 January 1981 in Superior Court, WAKE County. Heard in the Court of Appeals 4 February 1982.

Effective 25 April 1979, respondent, Earl Gibson, was dismissed from his employment as a Correctional Program Assistant-I (CPA-I) with the Sandhills Youth Center of the Division of Prisons of the North Carolina Department of Correction. Alleging racial discrimination, Gibson appealed his dismissal pursuant to G.S. 126-36 and Regulations of the State Personnel Commission. Following a hearing, a hearing officer of the State Personnel Commission, on 18 June 1980, found that Gibson was discriminated against in his dismissal because of race, and ordered reinstatement, back pay, and attorney's fees. On 29 August 1980, the State Personnel Commission adopted the "findings of facts and conclusions of the hearing officer as its own" and affirmed the relief ordered. On 1 October 1980 the Department of Correction filed a Petition for Judicial Review pursuant to the provisions of Article 4, Chapter 150A of the General Statutes. Following a hearing, the Wake County Superior Court, on 28 January 1981, entered an order reversing the decision of the State Personnel Commission and affirming the Department of Correction's action in dismissing Gibson. From the Superior Court order, Gibson appeals.

*Attorney General Edmisten, by Assistant Attorney General Richard L. Kucharski, for petitioner.*

*Lumbee River Legal Services, Inc., by Phillip Wright and Julian T. Pierce, for respondent appellant.*

BECTON, Judge.

FACTS

Gibson was dismissed from employment at Sandhills Youth Center (SYC) following an investigation into the escape of two inmates during April 1979 from the segregation area at SYC. The evidence, as it relates to Mr. Gibson, SYC, the escape, and the disciplinary action taken, follows.

Earl Gibson

Gibson, a black male, had been employed as a CPA-I at SYC for fourteen months prior to his dismissal. Superintendent F. D. Hubbard had initially recommended Gibson for employment and described him as an excellent candidate. Prior to his dismissal Gibson had made steady progress in his performance with the Department of Corrections (DOC). He had, in fact, been evaluated on 3 June 1978 and 18 April 1979 and was found to be a satisfactory employee both times.

On 23 April 1979 Gibson was assigned to work the segregation area of SYC. He began work at approximately 11:00 p.m. and worked until approximately 7:00 a.m. on 24 April. His responsibilities included checking each cell once an hour in the segregation area. Prison policy required Gibson to "see flesh" of each inmate at these hourly checks. Gibson was allegedly dismissed based on his failure to assure the presence of two inmates during his shift.

SYC

Sandhills Youth Center is a minimum security prison[1] which houses youthful offenders ages 18 to 21; it does not normally house dangerous inmates. The segregation area of SYC houses inmates who are assigned to either administrative or disciplinary segregation. Inmates are placed in "segregation" in order to house them in a secure facility and in order to remove them from the general population. Although there have been 119 escapes from SYC in the five-year period preceding the escape from the segregation area in April 1979, no person testifying had personal

---

1. Superintendent Hubbard testified: "I don't think there are any institutions in the State that are more minimum security than Sandhills Youth Center."

knowledge of an escape similar to the one made in April 1979 from a segregation cell.[2]

### The Escape

Two inmates, Crumpler and Dunlap, who had been placed in segregation for "being in an unauthorized area" escaped, and this led to Gibson's termination. The escape most likely occurred during the evening of 23 April 1979; it was discovered during the morning of 24 April 1979. Crumpler and Dunlap escaped by making a hole in the ceiling of their cell, going through a heating duct, and thence into the attic and over the roof.

When Gibson reported for segregation duty at 11:00 p.m. on 23 April 1979 he saw, in the segregation cell occupied by Crumpler and Dunlap, that a bed was turned over in the corner with the mattress lying on the floor. The figure of a body was lying on the mattress. On the other side of the cell, Gibson could see part of another bed in the corner although he could not see who was lying on it because the bed was located in a blind spot. Specifically he testified:

> You can't really see all of the corner through the hole in the door. You can peep far enough to see something like the mattress, but you can't really see all the way up the corner. If a man is in the corner, then you won't be able to see him. There were no changes in these circumstances throughout my shift.

Gibson further testified that Gerhard Kunert, the guard who preceded him on duty on the 3:00 p.m. to 11:00 p.m. shift, told Gibson that the cell had been like that for a while and that nothing was wrong. Kunert himself testified that when he came on duty at three o'clock that afternoon, the cell was in the same condition as it was at 11:00 p.m. Kunert testified: "I made my first check around 3:15. The bed was turned over in the cell at that time. I inquired about the bed and was told by the inmate that he wanted to sleep on the floor because it was cooler and better for his back."

---

2. Apparently there were a few escapes from the segregation area shortly after SYC was opened in 1974; however, Superintendent Hubbard knew of only two escapes "from inside a segregation cell."

Throughout his shift, Gibson saw no change in the cell and assumed that Crumpler and Dunlap were asleep in their beds. He did not see "living, breathing flesh" as he was required.

Gibson served breakfast to the inmates in segregation at the end of his shift the following morning. When he came to the cell of Crumpler and Dunlap, he received no response from either man. He threw a milk carton toward one of the beds, but still no one responded. Gibson then assumed that Crumpler and Dunlap did not want breakfast. He went home at the end of his shift without reporting this incident to his supervisor. Gibson testified: "On previous occasions when I was serving breakfast in segregation, it had been refused quite a few times, at least four or five times."

Carl Smith, the first shift guard on duty in the segregation area who took over for Gibson on the morning of 24 April 1979, did not personally check all of the segregation cells on his 7:30 a.m. check. Rather, he had another employee, Dennis Deese, check a portion of the segregation area, including the area that housed Crumpler and Dunlap. Deese did not see Crumpler or Dunlap and said nothing to Smith about Crumpler's and Dunlap's cell. Smith personally checked all of the cells at 8:30 a.m., but received no response at the cell. After talking to another inmate across the hall from Crumpler's and Dunlap's cell, Smith "bent [his] chest slightly and looked in the hole [in the door and] that is when I saw the bed had fallen over and hit the stool. There was a big hole in the ceiling. . . . Mr. Deese and I went in and he pulled the covers back and it was pillows or blue jeans or some stuff like that."

Disciplinary Action

For his failure to count physical bodies once each hour as required by prison rules throughout his entire eight-hour shift and for his failure to report that he was unable to awake Crumpler and Dunlap for breakfast, Gibson, who is black, was terminated. Angus Currie, the acting supervisor on Gibson's shift, was required to conduct at least one check of the segregation area during Gibson's shift. Currie, who is white, failed to make any checks. He has not been disciplined.[3] For his failure to perform a

3. It was not learned that Currie failed to make any checks until the hearing on 5 December 1979.

proper check of segregation cells by assuring the physical presence of inmates at his 10:30 p.m. check on 23 April 1979, Mr. Kunert, who is white, was given an oral warning with a follow-up letter. For his failure to insure the presence of the two inmates at the 7:30 a.m. check on 24 April 1979, Mr. Deese, who is white, was given an oral warning with a follow-up letter. Carl Smith, who is white and who had Dennis Deese make Smith's 7:30 check, was not disciplined.

Angus Currie also testified about an earlier escape when he and another white guard, O'Neal, were on duty. Currie made one floor check for O'Neal, who was to count inmates hourly, then O'Neal took over. At wake-up time, approximately 6:30 the following morning, O'Neal discovered that an inmate had escaped and found a dummy in the inmate's bed. No disciplinary action was taken against Currie, who is white. O'Neal, a white guard, received a reprimand.

ANALYSIS

Finding no North Carolina case stating the evidentiary standard to be used in the case of a State employee who alleges that he was terminated from his employment because of his race, the Commission used the evidentiary standards developed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e) *et seq.* The trial court, while not challenging the use of Title VII evidentiary standards, reversed the Commission and affirmed DOC's decision to dismiss Gibson after concluding that the Commission's decision was made upon unlawful procedure, was affected by error of law, was unsupported by substantial evidence, and was arbitrary and capricious, all in violation of G.S. 150A-51.

For the reasons that follow, we believe (a) that the evidentiary standards developed under Title VII are the appropriate evidentiary standards to be used in employment discrimination cases brought pursuant to G.S. 126-36; (b) that the Commission properly applied the Title VII evidentiary standards to this case and did not shift the burden of proof from Gibson to DOC; (c) that the Commission's decision was not made upon unlawful procedure; and (d) that the Commission's decision was supported by substantial evidence and was not arbitrary or capricious or otherwise affected by error of law.

I

A.  Use of Title VII Evidentiary Standards

[1]  G.S. 126-36 states in relevant part: "Any State Employee or former State Employee who has reason to believe that . . . termination of employment was forced upon him . . . because of his . . . race . . . shall have the right to appeal directly to the State Personnel Commission." North Carolina's Equal Employment Practices Act, G.S. 143-422.1, *et seq.*, contains the following specific legislative declaration:

> It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race . . . .

> It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment forments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

G.S. 143-422.2. The relevant part of Title VII states: "It shall be an unlawful employment practice for an employer (1) . . . to discharge any individual . . . because of such individual's race . . . ."

Given the similarity of the language of the State and federal statutes and the underlying policy of these statutes, it was eminently reasonable for the Commission to use Title VII standards in this case. The use of federal standards by our courts, whether developed pursuant to federal statutes or case law, is not new. For example, our courts have looked to federal decisions interpreting the Federal Rules of Civil Procedure, *see Sutton v. Duke*, 277 N.C. 94, 176 S.E. 2d 161 (1970), and *Connor v. Royal Globe Insur. Co.*, 56 N.C. App. 1, 286 S.E. 2d 810 (1982), and the Uniform Commercial Code, *see Evans v. Everett*, 10 N.C. App. 435, 179 S.E. 2d 120, *rev'd on other grounds*, 279 N.C. 352, 183 S.E. 2d 109 (1971). By way of further example, in deciding a case under North Carolina's Unfair Trade Practices Act, our Supreme Court said: "Because of the similarity in language, it is appropriate for us to look to the federal decisions interpreting the

FTC Act for guidance in construing the meaning of G.S. § 75-1.1."
*Johnson v. Insurance Co.,* 300 N.C. 247, 262, 266 S.E. 2d 610, 620
(1980).

*McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 36
L.Ed. 2d 668, 93 S.Ct. 1817 (1973), is the seminal case setting forth
the standard of proof for an individual discrimination case, and
the *McDonnell Douglas* evidentiary standards have been used by
other state courts.[4] *McDonnell Douglas* involved a three-step
process; it sets forth the following "basic allocation of burdens
and order of presentation of proof in a Title VII case," *Texas
Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252, 67
L.Ed. 2d 207, 215, 101 S.Ct. 1089, 1093 (1981): First, the employee
carries the initial burden of establishing, by a preponderance of
the evidence, a *prima facie* case of racial discrimination; second, if
the employee makes out a *prima facie* case, "[t]he burden then
must shift to the employer to articulate some legitimate, non-
discriminatory reason for the employee's rejection," *McDonnell
Douglas,* 411 U.S. at 802, 36 L.Ed. 2d at 678, 93 S.Ct. at 1824;
third, if the employer meets its burden, the employee is given the
opportunity to prove that the employer's stated reasons for ter-
mination were in fact a pretext for racial discrimination. *Id.* at
802-04, 36 L.Ed. 2d at 677-79, 93 S.Ct. at 1824-26.

### 1.   The Prima Facie Case

[2]   "The burden of establishing a prima facie case of disparate
treatment is not onerous." *Burdine,* 450 U.S. at 253, 67 L.Ed. 2d
at 215, 101 S.Ct. at 1094. In this case, Gibson needed only to
prove by a preponderance of the evidence that he was a member
of a racial minority and that he was qualified for his job, "but was
rejected under circumstances which give rise to an inference of
unlawful discrimination."[5] *Id.,* 67 L.Ed. 2d at 215, 101 S.Ct. at
1094.

---

4. *Fahn v. Cowlitz County,* 23 Empl. Prac. Dec. (CCH) ¶30986 (Washington
1980); *Kaster v. Independent School District No. 625,* 20 Empl. Prac. Dec. (CCH)
¶30173 (Minnesota 1979); *Smith College v. Massachusetts Com. Against Discrimina-
tion,* 18 Empl. Prac. Dec. (CCH) ¶8699 (Massachusetts 1978); *American Motors
Corp. v. DILHR,* 8 Empl. Prac. Dec. (CCH) ¶9757 (Wisconsin 1974).

5. Although the *McDonnell Douglas* Court in listing the elements of a *prima
facie* case stated that the employee must show "(i) that he belongs to a racial
minority; (ii) that he applied and was qualified for a job for which the employer was
seeking applicants; (iii) that, despite his qualifications, he was rejected; (iv) that,
after his rejection, the position remained open and the employer continued to seek
applicants from persons of complainant's qualifications," 411 U.S. at 802, 36 L.Ed.

We reject DOC's contention that Gibson failed to establish a *prima facie* case. Gibson showed that he was black, that he was discharged from his job, and that he was qualified for his job.[6] Gibson also showed that three white employees — Kunert, Deese, and Currie — either failed to make checks of "living flesh" or failed to make mandatory supervisory checks but were nevertheless retained.

> As the Court explained in *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577, [57 L.Ed. 2d 957, 967, 98 S.Ct. 2943, 2949-50] (1978), the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.

*Burdine*, 450 U.S. at 254, 67 L.Ed. 2d at 216, 101 S.Ct. at 1094.

2. The Employer's Burden of Production

[3] We must now, under the second prong of the *McDonnell Douglas* test, determine if DOC met its limited burden of rebutting Gibson's *prima facie* case. The burden that shifts to the employer is one of production, not persuasion. To rebut the presumption raised by Gibson's *prima facie* case, DOC's "evidence [must raise] a genuine issue of fact as to whether it discriminated against [Gibson]. To accomplish this, [DOC] must clearly set forth, through the introduction of admissible evidence, the reason for [Gibson's] rejection. The explanation provided must be legally sufficient to justify a judgment for [DOC]." *Id.* at 254-55, 67 L.Ed. 2d at 216, 101 S.Ct. at 1094.

The Commission, accepting the reasons offered by DOC for terminating Gibson, namely, that Gibson's conduct constituted

---

2d at 677, 93 S.Ct. at 1824, the *McDonnell Douglas* Court was only describing a model for a *prima facie* case based on the particular facts of that case. Indeed, the *McDonnell Douglas* Court stated in footnote 13 that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *Id.*, 36 L.Ed. 2d at 677-78, 93 S.Ct. at 1824.

6. Gibson was rated "satisfactory" in two performance appraisals, the last of which was done less than a week before he was terminated. Moreover, Mr. Simmons testified that Gibson was a good employee.

significantly greater negligence than that of Kunert, Deese and Currie, because Gibson's negligence occurred during his entire shift and because Gibson also failed to investigate suspicious circumstances when he was unable to awake the inmates after throwing the milk carton at the bed during breakfast, found as a fact that DOC met its burden at this stage. For purposes of this appeal, Gibson concedes that DOC met its limited burden of rebutting his *prima facie* case. The fact that DOC produced more evidence than it needed to produce at this second stage is understandable;[7] however, it does not end the inquiry.

### 3. The Employee's Burden of Showing Pretext

[4]   When an employer meets its burden of production by articulating a legitimate, non-discriminatory reason for discharge of an employee, the factual inquiry proceeds to the third step, and the employee has the burden of showing, by a preponderance of the evidence, that the reasons given for his discharge were pretexts for discrimination. Thus, in the case *sub judice*, Gibson retained the ultimate burden of persuading the Commission that he had been the victim of racial discrimination. And what must Gibson show if he is to prevail? "[Gibson] may succeed . . . either directly by persuading the court that a discriminatory reason *more likely* motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 67 L.Ed. 2d at 217, 101 S.Ct. at 1095 (emphasis added).

The analytical framework—the three-step progression—in *McDonnell Douglas* is obviously based on a practical realization that direct evidence of discriminatory motive or intent is difficult to find. Discriminatory motive is peculiarly within the mind of the discriminator. Or, to quote a noted commentator:

Perhaps the most striking feature, then, of contemporary race discrimination law is that it typically concerns conduct

---

7. Employers often seek to prove their case at the second stage rather than to wait to disprove the employee's case at the third stage. As stated in *Burdine*, "although the defendant does not bear a formal burden of persuasion, the defendant nevertheless retains an incentive to persuade the trier of fact that the employment decision was lawful. Thus, the defendant normally will attempt to prove the factual basis for its explanation." *Id.* at 258, 67 L.Ed. 2d at 218, 101 S.Ct. at 1096.

in which race as such is never mentioned. This is even more true of race than of sex discrimination . . . .

This transition from overt to subtle is observable, not just in employment discrimination, but in every category of race discrimination. Thus, no one bars blacks by name from a housing development; the issue rather takes such forms as the question whether zoning restrictions in effect exclude a disproportionate number of blacks. No one stands in the doorway of a restaurant with a pick handle to repel any blacks who might try to enter; the controversy shifts to such problems as whether the same effect is obtained by the private club device.

Larson, Employment Discrimination, § 66.11 (1981).

Recognizing then that an "admission of discriminatory intent is unlikely and [that] such intent would ordinarily have to be found by a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available,'" *Hoard v. Teletype Corp.*, 450 F. Supp. 1059, 1067 (E. D. Ark. 1978), and recognizing further that the hearing officer has "the task of evaluating the objectivity, sincerity, and honesty of the witnesses to arrive at a necessarily objective conclusion," *Long v. Ford Motor Co.*, 496 F. 2d 500, 506 (6th Cir. 1974), we review the evidence that was presented to the hearing officer.

In his Order, the Hearing Officer stated:

Mr. Gibson has shown that Mr. O'Neal, a white correctional officer, failed to make a proper check (see living, breathing flesh) on several rounds during a night shift which resulted in an escape of an inmate from a non-segregation area and that Respondent only reprimanded Mr. O'Neal for this offense. . . . It is difficulty [sic] to rationalize or comprehend the justification for retaining an employee who missed several checks and was presumably responsible for an escape simple [sic] because he later discovered the escape. . . . It is understandable how an employee could overrely on the supposedly "escape proof nature" of the segregation area, but not necessarily excusable. . . . It is not so easily understandable how an employee could fail to conduct proper checks in an area of the Center where he knew inmates could readily effect an escape.

We believe this is the kind of evidence the Supreme Court had in mind when it stated: "Especially relevant to such a showing [of pretext] would be evidence that white employees involved in acts against [the employer] of comparable seriousness . . . were nonetheless retained. . . ." *McDonnell Douglas*, 411 U.S. at 804, 36 L.Ed. 2d at 679, 93 S.Ct. at 1825. It should be noted that *McDonnell Douglas* refers to acts that are of "comparable seriousness;" it does not require the "acts" to be the same.

On the basis of the Hearing Officer's statement quoted above, DOC contends that the Commission "shifted the focus from requiring Mr. Gibson to prove discriminatory motive to requiring DOC to prove the absence of discriminatory motive by showing a 'compelling justification' for the difference in treatment." DOC's suggestion that an employer has no burden of showing "a compelling justification" for the difference in treatment it accords employees is, of course, true. However, no such burden was placed on DOC in this case. First, the Commission rejected DOC's proffered reasons for treating Gibson and O'Neal differently on credibility grounds. The Commission concluded that DOC had just cause to dismiss both employees and specifically found "the distinction illusory." Exercising its inherent function to determine the credibility and weight of evidence, the Commission also stated: "It is difficulty [sic] to rationalize or comprehend the justification for retaining an employee who missed several checks and was presumably responsible for an escape simple [sic] because he later discovered the escape." Second, Gibson had the burden of showing that DOC's proffered explanation was a pretext, or, stated differently, that DOC had no justification for retaining O'Neal and firing Gibson. Stating throughout its Order that this ultimate burden remained with Gibson, the Commission, without putting a burden of showing compelling justification on DOC, stated further:

> When just cause exists to terminate an employee and absent some compelling justification for his retention, the employee should be dismissed. Yet, no compelling justification can be raised for the instant aberration (Mr. O'Neil's retention) . . . . [T]he Commission can reasonably conclude that, in the absence of some compelling justification for the difference in treatment of the two employees, [DOC] discriminated against [Gibson] due to his race.

Significantly, the Commission was not limited to a comparison of the treatment accorded Gibson and O'Neal. *McDonnell Douglas* does not require Gibson to rely solely on new evidence at the third stage in order to show a "pretext." The evidence establishing a *prima facie* case when combined with testimony elicited on cross examination of defendant, may be sufficient to show the "pretext." As noted in *Burdine*:

> In saying that the presumption drops from the case, we do not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a prima facie case. A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

450 U.S. at 255, n. 10, 67 L.Ed. 2d at 216, n. 10, 101 S.Ct. at 1095, n. 10.

In this context it is to be remembered that Gibson presented evidence that three fellow white employees, Kunert, Deese, and Currie, failed to conduct a proper check of the cell which housed inmates Crumpler and Dunlap during the night and morning of the escape; that the segregation unit at SYC was generally considered escape-proof;[8] that SYC had experienced 119 escapes in

---

8. Superintendent Hubbard testified that a lattice work of rods was above the plaster ceiling in the segregation area "*except*, at that time, where the vent came through the bars. *The bars did not join at that one point . . . over the cell Crumpler and Dunlap were in.*" (Emphasis added.)

Gibson testified that he did not think it necessary always to see flesh since he was told that the segregation area was secure. He testified: "Since I have been here I have asked some of the more experienced men, Mr. Martin and Mr. Person, and they told me about the ceiling, that there were beams or whatever. There was a wire or something going across the top. I have asked them before if anybody had every [sic] escaped out of the top or if they could, but I was told that in the ceiling there was security in all the cells. So I didn't have any reason to suspect anybody of getting out. I figured the only way they could come out was through the door or the windows. I was not aware of the gap in the barwork at the heating duct over Crumpler and Dunlap's cell."

five years; that no one had been fired because of an escape; that Superintendent Hubbard recalls only two dismissals on the basis of negligent conduct from SYC, one being Gibson and the other being Eddie Pride, a black CPA-I who was dismissed for sleeping on the job. (Pride appealed his dismissal and was later reinstated.) Again, separate and apart from a hearing officer's duty to consider all the evidence in determining whether an employer's stated reasons for dismissing an employee were in fact a cover-up for what was in truth a discriminatory purpose is the obligation placed on hearing officers to determine the credibility of witnesses and the weight to be accorded the evidence.

The following example shows why we must give great deference to the finder of facts' subjective judgments based on credibility. At the hearing, and in a memorandum dated 28 April 1979, Superintendent Hubbard suggested that Gibson was not dismissed because of the escapes, but rather, because he failed to count residents in the segregation cells during his entire 8-hour shift and because he failed to react appropriately to a suspicious situation when the inmates failed to show signs of life at breakfast. On 25 April 1979, the morning after the escape, Gibson talked to Superintendent Hubbard. Gibson testified:

> In the beginning, the escape was the reason I got from Mr. Hubbard when I was dismissed. . . . I guess when the administration found out they didn't know what time Crumpler and Dunlap escaped, they had to find another reason to fire me. I just don't believe I was dismissed for failure to see flesh and make the count because other people have made the same mistake. . . . Mr. Kunert says he failed to make one count. If the inmates left between 7:30 and 8:00, he had to fail to make the count more than that . . . Dunlap said they left between 7:30 and 8:00.

(Superintendent Hubbard himself admitted that after Dunlap was recaptured, Dunlap gave a statement that he escaped between 7:00 p.m. and 7:30 p.m. on 23 April 1979.) In further support of Gibson's contention that he was initially told that he was fired because of the escape, Gibson introduced Superintendent Hub-

---

Similarly, Kunert testified, "I was under the impression that when they were in segregation they couldn't escape." Simmons, the second shift supervisor, testified: "I did not foresee that they would make an escape of the type they did."

bard's initial memorandum to him dated 28 April 1979 stating, in relevant part, that "this action is deemed necessary and . . . your negligence is most serious as proven by the escape of two medium custody felon inmates assigned to segregation and this not learned until after your tour of duty." On the basis of this conflict in the evidence and considering the facts (a) that 119 inmates had escaped prior to the incident involving Gibson without any employees being dismissed, and (b) that four white employees—Smith, Kunert, Currie and Haley—testified that they were not certain they always "counted flesh" on their hourly checks, the hearing officer may not have given credence to DOC's proffered explanation for the difference in treatment. Moreover, on the issue of racial discriminatory motive, the hearing officer may have treated as significant Superintendent Hubbard's initial comment to the following question: "If race was a factor in your decision to dismiss Mr. Gibson, would you testify to that fact?" Superintendent Hubbard's response was, "It depends on how big a man I am."[9]

For the foregoing reasons, we hold that the evidentiary standards developed under Title VII are the appropriate evidentiary standards to be used in employment discrimination cases brought pursuant to G.S. 126-36, and that the Commission properly applied the Title VII evidentiary standards to this case without shifting the burden of proof from Gibson to DOC.

## II

[5] Having shown that the appropriate legal standards were correctly applied by the Commission in this case, we turn to Gibson's second argument—that the trial court exceeded the proper scope of its review when it reversed the Commission and held that the Commission's decision was (a) unsupported by substantial evidence; (b) arbitrary and capricious; (c) made upon unlawful

---

9. On re-direct examination by DOC's lawyer, the following exchange took place:

Q.  You were asked if race played a part in your decision, would you admit that. Your answer, "It depends on how big a man I am." I need to know how big a man are you? Would you admit that?

A.  Yes, I would. No, I wouldn't. I wouldn't have any reason to be sitting here right now. If I would admit it, you know . . . I don't think I could be where I am for that matter.

procedures; and (d) affected by error of law, all in violation of G.S. 150A-51. Gibson's second argument clearly sets forth the issues presented for review. The parties, by couching the issues in the language of G.S. 150A-51, have clearly delineated the scope of our review. *See Utilities Comm. v. Oil Co.*, 302 N.C. 14, 21, 273 S.E. 2d 232, 236 (1981). Having thoroughly reviewed the record, we agree with Gibson.

> When the judge of the superior court sits as an appellate court to review the decision of an administrative agency pursuant to G.S. § 150A-51, . . . the findings of fact made by the administrative agency, if supported by competent, material and substantial evidence when viewed on the record as a whole, are conclusive upon the reviewing court.

*In re Faulkner*, 38 N.C. App. 222, 225-26, 247 S.E. 2d 668, 670 (1978). The trial court is not allowed to "weigh the evidence presented to the [Commission] and substitute its evaluation of the evidence for that of the [Commission]." *In re Appeal of Amp, Inc.*, 287 N.C. 547, 562, 215 S.E. 2d 752, 761 (1975).

G.S. 150A-51, the general judicial review statute, allows trial courts to reverse a decision of state boards, commissions, and agencies if the decision is "[u]nsupported by substantial evidence . . . in view of the entire record as submitted. . . ." G.S. 150A-51(5).

> This standard of judicial review is known as the "whole record" test and must be distinguished from both *de novo* review and the "any competent evidence" standard of review. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 95 L.Ed. 456, 71 S.Ct. 456 (1951); *Underwood v. Board of Alcoholic Control*, 278 N.C. 623, 181 S.E. 2d 1 (1971); Hanft, *Some Aspects of Evidence in Adjudication by Administrative Agencies in North Carolina*, 49 N.C.L. Rev. 635, 668-74 (1971); Hanft, *Administrative Law*, 45 N.C.L. Rev. 816, 816-19 (1967). The "whole record" test does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo, Universal Camera Corp., supra.* On the other hand, the "whole record" rule requires the court, in determining the substantiality of evidence supporting the Board's decision, to take into account whatever in the record fairly

detracts from the weight of the Board's evidence. Under the whole evidence rule, the court may not consider the evidence which in and of itself justifies the Board's result, without taking into account contradictory evidence or evidence from which conflicting . inferences could be drawn. *Universal Camera Corp., . . .*

*Thompson v. Board of Education,* 292 N.C. 406, 410, 233 S.E. 2d 538, 541 (1977).

By definition, then, the whole record test is generally used in cases in which there is conflicting or contradictory evidence. Thus, in *Comr. of Insurance v. Rate Bureau,* 300 N.C. 381, 405, 269 S.E. 2d 547, 564, *pet. for rehearing denied,* 301 N.C. 107, 273 S.E. 2d 300 (1980), our Supreme Court was unwilling to hold as error the Insurance Commissioner's reliance on uncontested evidence presented to him, saying: "Unlike *Thompson v. Wake County . . .* and *In Re Rogers* [297 N.C. 48, 253 S.E. 2d 912 (1979)], where the Court was concerned with conflicting and contradictory evidence, the expert witness's testimony here with respect to unaudited data was not contradicted." When an administrative body finds a fact in accordance with the uncontradicted evidence, little remains for the reviewing court to do, other than to "find no error in the [administrative body's] election to accord the necessary weight and credibility to the testimony. . . ." *Comr. of Ins. v. Rate Bureau,* 300 N.C. at 406, 269 S.E. 2d at 565.

Even when there is conflicting and contradictory evidence and inferences, "it is for the administrative body, in an adjudicatory proceeeding, to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and appraise conflicting and circumstantial evidence. [Citation omitted.] *Id.,* 269 S.E. 2d at 565. Therefore, "[t]he 'whole record' test is not a tool of judicial intrusion; instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence." *In re Rogers,* 297 N.C. 48, 65, 253 S.E. 2d 912, 922 (1979).

In this case, the trial court concluded that the Commission rendered a decision unsupported by substantial evidence and acted arbitrarily and capriciously to the extent that the Commission's decision was affected by its failures (a) to consider uncon-

tradicted evidence which, according to the trial court, showed an absence of discriminatory motive, (b) properly to consider certain specified findings which, in the view of the trial court, tended to negate the allegations of discriminatory motive, and (c) to accept Superintendent Hubbard's reasons for the difference in treatment between O'Neal and Gibson.

We discuss the trial court's concerns *seriatim.* Here follows the only "uncontradicted evidence, not considered by the Commission" that the trial court included in its Order:

> That respondent had made steady progress with the department before his dismissal; that 41% of the work force at the center was Negro; that the Superintendent of the center had written a favorable letter recommending respondent's initial employment; that respondent had received training identical to that of all other correctional officers.

Our review of the Commission's Order reveals, contrary to the trial court's suggestion, that the Commission found and concluded that Gibson made steady progress with the Department before his dismissal and further noted that Gibson received training identical to that of other correctional officers. And while it is true that the Commission did not specifically find that 41% of the work force at the Center was black and that Superintendent Hubbard wrote a favorable letter recommending Gibson's initial employment, it would take, in Gibson's words, a "quantum leap of logic" to say that those two factors were not considered by the Commission and to then hold that those two factors constitute the sufficient evidence necessary to negate the Commission's finding of racial discrimination. It suffices to say that the racial make-up of the Center and the favorable letter of recommendation may have resulted from several factors, including an affirmative action program, and may have nothing to do with an individual discharge case. The weight, if any, to be given to this evidence was a function of the Commission, not the trial court.

We turn now to the following specific findings by the Commission, which, in the trial court's view, tended to show no discrimination: "that Gibson was guilty of the acts charged; that the acts constituted just cause for dismissal; and that Gibson was treated fairly with respect to two white employees who were involved in the situation which precipitated respondent's dismissal."

It suffices to point out that these three facts were obviously considered by the Commission which listed them as findings of fact and which used them in its second step *McDonnell Douglas* analysis (*see* Part IA.2., *supra*). Again, on what, for purposes of this appeal, was uncontradicted and unchallenged evidence, the trial court's judgment on these matters usurps the Commission's authority. This the trial court is not allowed to do under the guise of the whole record test.

Finally, the trial court takes issue with the Commission's ultimate conclusion that Gibson carried his burden of proving racial discrimination. The trial court, taking as true Superintendent Hubbard's explanation for treating Gibson and O'Neal differently, concludes, *a fortiori*, that Superintendent Hubbard did not make an unreasonable management decision when he disciplined Gibson more harshly than O'Neal. Again, the testimony concerning both Gibson's and O'Neal's failures to check "living, breathing flesh" during their tour of duty, including, but not limited to, the number of checks each person missed and the differences between the segregation area and the dormitory area at the Center, was uncontradicted. Neither this Court nor the trial court is compelled to accredit Superintendent Hubbard's proffered reason for the difference in treatment. This is especially true in this case in which we have to determine not what happened, but why something happened. The Commission, hearing the evidence and observing the demeanor of witnesses, was in a much better position than those of us who review "cold" records to determine what the uncontested facts show.

The Commission's findings of fact and conclusions of law were not arbitrary or capricious; they were not made upon unlawful procedures. They were supported by competent, material and substantial evidence when viewed on the record as a whole, and they are conclusive on the reviewing Court.

For the reasons stated, the Order of the trial court is reversed and the case is remanded to the Superior Court for entry of an Order reinstating the Order of the State Personnel Commission.

Reversed and Remanded.

Harrell v. Wilson County Schools

Judge HILL concurs.

Judge HEDRICK dissents.