AMERICAN MOTORS SALES CORPORATION AND HUBERT VICKERS D/B/A
421 MOTOR SALES, PETITIONERS v. ELBERT L. PETERS, COMMISSIONER OF
MOTOR VEHICLES, RESPONDENT, AND JAMES WILSON PENNELL D/B/A PEN-
NELL MOTOR COMPANY, INTERVENOR

Nos. 555A82 and 130PA82

(Filed 6 July 1984)

1. Monopolies § 2— characteristics of a monopoly

The distinctive characteristics of a monopoly are (1) control of so large a
portion of the market of a certain commodity that (2) competition is stifled, (3)
freedom of commerce is restricted and (4) the monopolist controls prices.

2. Automobiles and Other Vehicles § 5; Monopolies § 2— prohibition of additional
Jeep franchise—no creation of monopoly

The Commissioner of Motor Vehicles' prohibition of an additional
American Motors Jeep franchise in the North Wilkesboro market area pur-
suant to G.S. 20-305(5) did not operate to stifle competition or allow undue con-
trol of prices by either American Motors or its existing franchisee in the
selling of American Motors Jeeps and, therefore, did not create a monopoly in
violation of Art. I, § 34 of the N. C. Constitution.

3. Automobiles and Other Vehicles § 5; Monopolies § 2— prohibition of additional
motor vehicle franchise—constitutionality of statute

The statute authorizing the Commissioner of Motor Vehicles to prevent
additional franchises for a particular line-make of motor vehicle in a given
trade area when such a franchise already exists, G.S. 20-305(5), does not on its
face create and perpetuate monopolies in violation of Art. I, § 35 of the N. C.
Constitution since the statute essentially protects franchisees from abuses of
vertical integration and is not on its face designed to lessen competition or in-
crease prices.

4. Automobiles and Other Vehicles § 5— enjoining additional motor vehicle fran-
chises—no authority by Commissioner of Motor Vehicles

The Commissioner of Motor Vehicles exceeded his authority in enjoining
future practices of American Motors and its additional franchisees in a trade
area, since the Commissioner is not authorized by G.S. 20-301(t) to issue injunc-
tions but is authorized to seek injunctions only through normal judicial chan-
nels. However, the Commissioner was authorized by the statute to deny a
motor vehicle manufacturer the privilege of franchising an additional line-make
dealer if he determined that the market in the given trade area would not sup-
port it, and the Commissioner was thus authorized to invalidate or revoke such
a franchise already in effect.

5. Automobiles and Other Vehicles § 5— grant of new motor vehicle fran-
chise—written notice to present franchisee

Ample evidence supported a determination by the Commissioner of Motor
Vehicles that a Jeep franchisee in a certain trade area received no written

notice from American Motors of its intent to grant a new Jeep franchise in the trade area as required by G.S. 20-305(5).

Justice MITCHELL did not participate in the consideration or decision of this case.

APPEAL by petitioners in No. 555A82 from a decision of a divided panel of the Court of Appeals, 58 N.C. App. 684, 294 S.E. 2d 764 (1982), affirming an order by *Judge Robert Hobgood,* presiding in WAKE Superior Court, entered on 24 March 1981. On petition for review before determination by the Court of Appeals in No. 130PA82 of an order of *Judge Bailey,* presiding at the 19 October 1981 Civil Session of WAKE Superior Court.

*Womble, Carlyle, Sandridge & Rice by William F. Womble, Jr. and James M. Stanley, Jr., for petitioner appellants.*

*Rufus L. Edmisten, Attorney General, by William W. Melvin, Deputy Attorney General, for respondent appellee.*

*White and Crumpler by Craig B. Wheaton, for intervenor appellee.*

*Johnson, Gamble & Shearon by Samuel H. Johnson and Richard J. Vinegar, for amicus curiae North Carolina Automobile Dealers Association.*

EXUM, Justice.

After a hearing held pursuant to N.C. Gen. Stat. § 20-305(5) (1978),[1] the Commissioner of Motor Vehicles concluded that the North Wilkesboro market area for American Motors Jeeps would

---

1. This statute provided that no manufacturer of motor vehicles may:

"grant an additional franchise for a particular line-make of motor vehicle in a trade area already served by a dealer or dealers in that line-make unless the franchisor first advised in writing such other dealers in the line-make in the trade area; provided that no such additional franchise may be established in the trade area if the Commissioner has determined, if requested by any party within 30 days after receipt of the franchisor's notice of intention to establish the additional franchise, and after a hearing on the matter, that there is reasonable evidence that after the grant of the new franchise, the market will not support all of the dealerships in that line-make in the trade area; trade areas are those areas specified in the franchise agreement or determined by the Motor Vehicle Dealers' Advisory Board . . . ."

It is the above version of this statute which governs this case. The statute was amended, effective 7 August 1983; but the amended version does "not affect pending litigation." 1983 N.C. Sess. Laws, c. 704, § 25. *See* N.C. Gen. Stat. § 20-305(5) (1983).

not support two dealerships and, further, that American Motors did not comply with the statute's notice requirements. The Commissioner, therefore, revoked an American Motors Jeep dealership franchise for this area to Herbert Vickers, d/b/a 421 Motor Sales (Vickers), since James Pennell, d/b/a Pennell Motor Company (Pennell), was already so franchised in this area. The Commissioner also enjoined Vickers "against further advertising, promoting or trading in new AMC Jeeps." He enjoined American Motors from granting "AMC Jeep franchises in the North Wilkesboro . . . trade area without first complying" with the statute.

The principal question before us is whether the statute violates the Anti-monopoly Clause of the North Carolina Constitution, Article I, Section 34. We hold that it does not. We also hold that the Commissioner's determination that Pennell had not been "advised in writing" by American Motors of its intention to grant another Jeep dealership franchise in Pennell's market area was correctly sustained by the lower courts. We hold further that the Commissioner has no authority to grant injunctive relief.

In Case No. 130PA82, Pennell, on 13 November 1979, petitioned the Motor Vehicles Commissioner, alleging its franchise from American Motors as a Jeep dealer, its knowledge "after extensive inquiries" that American Motors had granted a like franchise in Pennell's market area to Vickers and its lack of notice from American Motors that it intended to grant this franchise. Pennell prayed for a hearing pursuant to N.C. Gen. Stat. § 20-305(5), invalidation of the Vickers franchise, and injunctions prohibiting Vickers and American Motors from, respectively, "advertising, promoting or trading in AMC Jeeps in Wilkes County" and "any further purported grants of AMC Jeep franchises in the Wilkes County area." After a hearing the Commissioner made findings[2] which supported his conclusion that the "Jeep market

---

2. He found:

"18. The North Wilkesboro, North Carolina Market Area includes the towns of Boomer, Elkin, Ferguson, Glade Valley, Hays, Jonesville, Laurel Springs, McGrady, Millers Creek, Moravian Falls, North Wilkesboro, Piney Creek, Purlear, Roaring Gap, Roaring River, Ronda, Scottville, Sparta, State Road, Thurmond, Traphill, Whitehead, Wilbar and Wilkesboro, which area comprises all of Wilkes County as well as portions of Surry and Alleghany counties.

19. There were 58 Jeep registrations in Wilkes County in the period from August 1978 to July 1979. There were 35 Jeep registrations in Wilkes County

American Motors Sales Corp. v. Peters

will not support all of the Jeep dealerships [Pennell and Vickers] in the North Wilkesboro . . . trade area."

After the Commissioner's order, dated 9 March 1981, the decretal portions of which are as set out above, American Motors and Vickers petitioned pursuant to N.C. Gen. Stat. § 150A-43 for judicial review in Wake Superior Court. Judge Bailey on 22 October 1981 affirmed the Commissioner's order on the sole ground that "the required written notice, pursuant to G.S. 20-305(5) was not given. . . ." American Motors and Vickers appealed to the Court of Appeals.

Meanwhile, in a separate proceeding, No. 555A82, American Motors and Vickers on 10 March 1981 petitioned Wake Superior Court for an *ex parte* stay of the Commissioner's order pending "judicial review of said" order. Judge Godwin on 11 March 1981 stayed *ex parte* the Commissioner's order "during the pendency of judicial review." Contending that Judge Godwin's *ex parte* stay expired after ten days pursuant to Civil Procedure Rule 65(b), Pennell moved to intervene in No. 555A82 and prayed that Judge Godwin's *ex parte* stay "be lifted" and for "an immediate hearing." On 2 April 1981 Judge Robert Hobgood, after a hearing, allowed Pennell to intervene, concluded that Judge Godwin's *ex parte* order had expired on 21 March 1981, and denied American Motors and Vickers' motion to continue the stay of the Commissioner's order. On American Motors and Vickers' appeal the Court of Appeals, Judges Webb and Wells, affirmed over Judge Robert Martin's dissent. American Motors and Vickers appealed by right, N.C. Gen. Stat. § 7A-30, to us.

We initially denied American Motors and Vickers' petition in No. 130PA82 to bypass the Court of Appeals; but after the appeal

in the period from August 1979 to August 1980 when both Pennell and 421 were competing for Jeep customers."

"22. Pennell sold 31 new Jeep vehicles in the period from August 1978 to July 1979. In the period from August, 1979 to July 1980, when Pennell was competing with 421, Pennell sold 16 new Jeep vehicles and 421 sold 16 new Jeep vehicles."

"32. The evidence indicates that the establishment of an additional Jeep dealer in the North Wilkesboro, North Carolina market area has had the effect of splitting the existing sales, which are declining from year to year, between the two dealers, and dividing the sales of the existing dealer in half all to the harm of the existing dealer."

in No. 555A82 was docketed, we allowed the petition in No. 130PA82 on reconsideration. Both cases have been consolidated for the purposes of argument, decision and opinion.

We note first our disagreement with Judge Bailey's conclusion in No. 130PA82 that the Commissioner's order can be affirmed solely on the ground that American Motors failed to advise in writing its existing franchisee of its intention to grant another franchise as the statute requires. If, as appellants contend, the statute violates our constitution's Anti-monopoly Clause, then whether or not American Motors gave the required statutory advice, the Commissioner would be powerless to invalidate the new franchise. We must, therefore, answer the constitutional question — the question which divided the Court of Appeals.

I.

Appellants contend the prohibition of additional line-make motor vehicle dealership franchises in a given trade area by the Commissioner of Motor Vehicles in a proceeding pursuant to N.C. Gen. Stat. § 20-305(5) amounts to the creation of a monopoly by existing franchisees in violation of Art. I, § 34 of the North Carolina Constitution.[3] A majority of the Court of Appeals in No. 555A82 rejected this contention, but Judge Robert Martin, dissenting, and relying largely on *Georgia Franchise Practices v. Massey-Ferguson*, 244 Ga. 800, 262 S.E. 2d 106 (1979), and *In re Hospital*, 282 N.C. 542, 193 S.E. 2d 729 (1979), thought the statute "unconstitutional as it encourages monopolies" in violation of Art. I, § 34. After giving the matter careful consideration, we determine the Court of Appeals' majority correctly decided the constitutional issue presented.

Our analysis of the constitutional question presented begins with an examination of the operation of this statute in light of various economic considerations. A monopoly results from ownership or control of so large a portion of the market for a certain commodity that competition is stifled, freedom of commerce is restricted, and control of prices ensues. It denotes an organization or entity so magnified that it suppresses competition and acquires

---

3. This section states: "Perpetuities and monopolies are contrary to the genius of a free state and shall not be allowed."

a dominance in the market. The result is public harm through the control of prices of a given commodity. *State v. Atlantic Ice & Coal Co.*, 210 N.C. 742, 747-48, 188 S.E. 412, 415 (1936). Implicit in this definition of a monopoly is the corollary that a restraint of trade must not result in a monopoly. *Durham v. State of North Carolina*, 395 F. 2d 58 (4th Cir. 1968). While all monopolies restrain trade, not every restraint of trade leads to a monopoly in a particular market.

[1] The distinctive characteristics of a monopoly are, then, (1) control of so large a portion of the market of a certain commodity that (2) competition is stifled, (3) freedom of commerce is restricted and (4) the monopolist controls prices. We turn now to an examination of the facts in light of these criteria.

[2] Pennell's franchise does not give it control of so large a portion of the AMC Jeep market as to stifle competition or control prices. His franchise serves, according to its terms, the "North Wilkesboro Market Area," which, according to the Commissioner's findings, comprises Wilkes County in its entirety and portions of Surry and Alleghany Counties. While his franchise agreement gives him control of AMC Jeeps in this trade area, we hardly consider it to constitute the "market" as that term is used in our definition of a monopoly. In order to monopolize, one must control a consumer's access to new goods by being the *only* reasonably available source of those goods. A consumer must be without reasonable recourse to elude the monopolizer's reach. Logically, then, the market encompasses geographically at least all areas within reasonable proximity of potential customers.

The AMC Jeep market for a resident of the North Wilkesboro Market Area extends beyond those arbitrary lines set by AMC. The record shows and the Commissioner found that within the last two years, Jeep dealerships existed in all counties adjacent to Wilkes except Alleghany and Yadkin. Much of Alleghany and Yadkin Counties are closer to Jeep dealerships in another county than they are to Pennell's dealership serving the North Wilkesboro Market Area. Surry County, a portion of which lies in the North Wilkesboro Market Area, is one of those counties adjacent to Wilkes with a Jeep franchise. The factual findings reveal that many consumers in the North Wilkesboro Market Area may,

in fact, be geographically closer to a Jeep dealer other than Pennell. Even if they are not closer, these potential customers are within reasonable range of those dealers. Advertising and other sales devices easily cross county lines via the media, including newspapers, radio, and television. Jeep franchises in a number of proximate counties may compete with one another. Through this competition, prices may fluctuate as various dealers vie for customers. The Commissioner's decision to deny another franchise in the North Wilkesboro Market Area does not on this record operate to stifle competition or allow undue control of prices by either American Motors or its existing franchisee in the selling of AMC Jeeps. No monopoly, therefore, is created by the Commissioner's action in this case pursuant to the statute.

We recognize that prohibiting additional franchises amounts to a restraint of trade. But the restraint of intra-brand trade contemplated by the statute in question is not such as to amount to the creation of a monopoly. *See American Motors Sales Corporation v. Division of Motor Vehicles of the Commonwealth of Virginia*, 592 F. 2d 219, 223-24 (4th Cir. 1979).[4] While competition may not be as full and free as with multiple AMC Jeep franchises existing in the North Wilkesboro Market Area, it is by no means eliminated. More than a mere adverse effect on competition must arise before a restraint of trade becomes monopolistic. *See generally Exxon Corporation v. Governor of Maryland*, 437 U.S. 117 (1978). *Accord, New Motor Vehicles Brand v. Orrin W. Fox Co.*, 439 U.S. 96 (1978). Thus, while the trading of AMC Jeeps is restrained by the statute's operation in this situation, no control of the market or adverse effect on prices and competition, sufficient to constitute a monopoly, results.

II.

[3] Appellants suggest that the statute on its face creates and perpetuates monopolies. We disagree.

---

4. The Virginia statute is almost identical to the North Carolina statute and provides that an automobile manufacturer may not grant an additional franchise of a particular line-make motor vehicle in a given trade area where a franchise of that line-make already exists if the Commissioner of Motor Vehicles determines that the market will not support all franchises. Virginia Code § 46.1-547(d) (1980).

Courts ordinarily seek the meaning of a legislative provision first from the language of the statute itself. When the language of the statute is sufficiently clear in its context, it controls. *See State ex rel. Utilities Commission v. Edmisten,* 291 N.C. 451, 232 S.E. 2d 184 (1977); *Underwood v. Howland,* 274 N.C. 473, 164 S.E. 2d 2 (1968).

By the limited nature of its language, the statute in question regulates only the granting of additional franchises for a particular line-make of motor vehicle in a given trade area where such a franchise already exists. The clear meaning and import of the statute is to restrict intra-brand competition. Of central importance to the validity of this legislation is the recognition that if it restrains trade, it does so vertically rather than horizontally. A vertical restraint runs from the manufacturer down through the distributer, ending ultimately with the retailer. Horizontal restraints, on the other hand, run between dealers and dealers or retailers and retailers, all operating on the same level. Horizontal restraints run contrary to the public interest because they stifle competition, whereas vertical restraints leave to the public the benefit of competition at a particular level of the marketing process. *Bulova Watch Co., Inc. v. Brand Distributors of North Wilkesboro, Inc.,* 285 N.C. 467, 480, 206 S.E. 2d 141, 150 (1974). To the extent that the statute authorizes the Commissioner to effectuate vertical restraints on the marketing of motor vehicles, it does no offense to the constitutional proscription of monopolies. Horizontal restraints impede competition and lead inexorably to increased prices. That is the evil which the anti-monopoly provision seeks to prevent. *See Tober Foreign Motors, Inc. v. Reiter Oldsmobiles, Inc.,* 376 Mass. 313, 325-30, 381 N.E. 2d 908, 915-17 (1978).

The statute does not restrain trade among automobile retailers. It only authorizes the Commissioner to prevent additional franchises of a particular line-make in a given trade area when the market will not support it. The manufacturers retain a tremendous incentive to police pricing abuses by their retailers. They may guard against such practices by establishing and enforcing sales quotas and price ceilings. Smith, *Franchise Regulation: An Economic Analysis of State Restrictions on Automobile Distribution,* 25 J. Law & Econ. 125, 128-29 (1982). Indeed,

manufacturers have a keen self-interest in the competitive status of their retailers.

The statute essentially incorporates the economic realities of automobile marketing. Automobile manufacturers simply cannot operate their local dealerships from central offices in a cost-effective manner.[5] In response to this situation, the franchise system evolved. It offered a preferred method of distribution reflecting decreased cost and irritations of an integrated system. *H. Brown, Franchising: Realities and Remedies* 2 (2nd ed. 1978).

But it, too, revealed inherent difficulties, the most significant of which was the disparity in bargaining positions between the manufacturers and the retailers or franchisees. *See* Kessler, *Automobile Dealer Franchises: Vertical Integration by Contract* 66 Yale L.J. 1135, 1156 (1957) (referring to automobile franchise agreements as contracts of adhesion and economic deathtraps). To counter this imbalance, states enacted statutes like the one involved in this case. These statutes provide some protection from abuse of franchisees by manufacturers.

The franchise system provides benefits to both the manufacturer and the retailer.[6] The former retains retail incentives and effective control over product distribution to the consumer. The system induces investments in service and sales facilities by the retailer, all to the ultimate benefit of the manufacturer, as they enhance the attractiveness of the product to the consumer. The franchisee or retailer benefits primarily from territorial security. Smith, *supra*, at 126-27. It is to this benefit of the franchisee — territorial security — that the North Carolina statute is directed. If a manufacturer could routinely invade a particular market area with additional franchises of certain line-makes, the original fran-

---

5. North Carolina law prohibits an automobile manufacturer from owning, operating, or controlling a motor vehicle dealership in a trade area already served by a motor vehicle dealer under a franchise for the same line-make by that manufacturer. N.C. Gen. Stat. § 20-305.2 (1978).

6. An additional benefit of the automobile franchise system, and one which provides a legitimate justification for a state's regulatory protection of automobile franchises, is that it allows minorities and ordinary citizens to gain access to the economic system. By enhancing the availability of franchises through decreased cost and territorial security, people who lack tremendous capital and are less affluent may at least consider undertaking a franchise. *See* Note, *State Motor Vehicle Franchise Legislation: A Survey and Due Process Challenge to Board Composition,* 33 Vand. L. Rev. 385, 386-87 (1980).

chisee suffers from the loss of perhaps its most important benefit of the franchise system. The legislature responded to this unequal bargaining situation with the statute in question. By restricting the influx of additional line-make franchises in a given market area, the statute limits the franchisee's "economic death sentence" threatened by the franchise system. Kessler, *supra,* at 1156. This legislative determination represents a valid exercise of the state's extensive police power designed, in this case, "to promote the economic welfare of the public (or a particular group in need of relief from hardship or duress)." *United States v. Women's Sportswear Manufacturers Association,* 336 U.S. 460, 464 (1949).

Thus, the facial validity of the statute hinges on the acceptability of vertical integration itself. Although vertical restraints affect the number of entities in a market, they do not, in and of themselves, result in monopolies. *See Watch Co.,* 285 N.C. at 480-81, 206 S.E. 2d at 150-151. The franchising system used by automobile manufacturers neither unduly restrains competition nor escalates prices. Manufacturers may sell only to certain dealers without illegally restraining trade. "[I]f nothing more is involved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, . . ." then no monopoly results. *United States v. Arnold, Schwinn and Co.,* 388 U.S. 365, 376 (1967).

Appellants argue that two of our prior cases control our decision regarding the monopoly issue: *In re Certificate of Need for Astin Park Hospital, Inc.,* 282 N.C. 542, 193 S.E. 2d 729 (1973); *State v. Ballance,* 229 N.C. 764, 51 S.E. 2d 731 (1949). We find both cases easily distinguishable. In *In re Hospital,* we held that the statutory requirement of obtaining a certificate of need prior to constructing a private hospital violated the Anti-monopoly Clause of the North Carolina Constitution. Our decision turned on the absence of a rational relationship between the required certificate of need and any public good or welfare consideration. Furthermore, that requirement constituted a horizontal restraint since it regulated available services at the same level across the state. 282 N.C. at 548, 193 S.E. 2d at 734. In *Ballance,* we held unconstitutional a statute which imposed licensing requirements on the photography profession. We found no reasonable relationship

between the restraint on a person's liberty to engage in a legitimate and harmless profession and the public welfare. 229 N.C. at 770-772, 51 S.E. 2d at 735-36. Neither case controls the disposition of the instant appeal. Unlike both of those cases, the statute at bar imposes a vertical rather than horizontal restraint on the automobile industry. Furthermore, as we have already noted, the state possesses an important interest in protecting automobile dealerships from manufacturer's abuse of the franchise system, an interest which is accomplished by the statute in question.

Appellants suggest, as did Judge Martin in his dissent below, that we follow the lead of our sister state, Georgia. *See Georgia Franchise Practice Commission v. Massey-Ferguson, Inc.*, 244 Ga. 800, 262 S.E. 2d 106 (1979). *See generally General GMC Trucks, Inc. v. General Motors Corporation*, 239 Ga. 373, 237 S.E. 2d 194 (1977) (invalidating a similar statute under the Commerce Clause of the United States Constitution). *Georgia Franchise* invalidated, without substantial discussion, a state statute which restricted the granting of new franchises of the same line-make motor vehicle in trade areas where a franchise of that line-make already existed. The Georgia Court relied on Article III, section 8, paragraph 8 of the 1976 Georgia Constitution [now Art. III § 6 par. 5(c) of the 1983 Georgia Constitution] which prohibits the legislature from authorizing "any contract or agreement which may have the effect of or which is intended to have the effect of defeating or lessening competition, or encouraging a monopoly, which are hereby declared null and void." Although the Court cited *GMC Trucks*, that case neither discussed nor referred to the Georgia Constitution. We decline to follow *Georgia Franchise*, noting that the Georgia constitutional provision, unlike its North Carolina counterpart, concerns legislation having "the effect . . . of defeating or lessening competition . . .," as well as "encouraging a monopoly." Thus, its scope seems considerably more far-reaching into the area of commerce than our anti-monopoly provision. Notwithstanding whatever differences might flow from the broader, more inclusive language of the Georgia constitutional provision, we are not persuaded by the reasoning of the Georgia Court.

Since the North Carolina statute essentially protects franchisees from abuses of vertical integration and is not on its face

designed to lessen competition or increase prices, we find N.C. Gen. Stat. § 20-305(5) does not run afoul of the Anti-monopoly Clause of the North Carolina Constitution.

## III.

[4] Appellants next contend the Commissioner exceeded his authority by issuing injunctions against them. Specifically, they point to the order's provisions whereby (1) AMC's grant of a franchise to 421 is "enjoined, invalidated and revoked"; (2) 421 is "enjoined" from further advertising, promoting or trading in AMC Jeeps; and (3) AMC is "enjoined" from granting other franchises in the relevant trade area absent compliance with the state guidelines. The Court of Appeals rejected these assertions, holding that the Commissioner had not issued an injunction. Essentially, the Court of Appeals concluded that the order reflected simply an inartful use of language by the Commissioner.

The statute does not authorize or empower the Commissioner to issue injunctions. N.C. Gen. Stat. § 20-301 (authorizing the Commissioner to prevent unfair trade practices and conduct hearings pursuant to the exercise of this authority). When one engages in practices contrary to the letter and spirit of the statute, an injunction may be warranted. The statute provides a mechanism through which such an injunction may issue:

> The Commissioner may, whenever he shall believe from evidence submitted to him that any person has been or is violating any provision of this [statute], in addition to any other remedy bring an action in the name of the state against such person and any other persons concerned or in any way participating in, or about to participate in practices and acts so in violation, to enjoin such persons and such other persons from continuing the same.

*Id.* § 20-301(d).

The statutory language is abundantly clear. The legislature authorized the Commissioner to seek injunctions through normal judicial channels. It did not authorize him to issue injunctions. The parties do not advance this position, and the Court of Appeals did not so hold.

The statute does, however, empower the Commissioner to deny a motor vehicle manufacturer the privilege of franchising an

additional line-make dealer if he determines the market in the given trade area will not support it. Perforce the Commissioner is authorized to invalidate or revoke such a franchise already in effect at the time of the hearing. Insofar as the Commissioner's order revoked and invalidated the franchise here in question, it was within the Commission's statutorily delegated powers. Insofar as the order enjoined future practices of American Motors or Vickers, the order exceeds the Commissioner's authority.

IV.

[5]  Finally, we consider appellants' contention that they complied with the notice requirement of the statute.[7] Before a manufacturer may grant an additional franchise for a particular line-make of automobile, it must "first [advise] *in writing* such other dealers in the line-make [which operate] in the trade area . . . ." N.C. Gen. Stat. § 20-305(5) (emphasis added). After taking evidence on this issue, the Commissioner found as a fact that "Pennell received no written notice from [AMC] informing Pennell of [AMC's] intention to grant a Jeep franchise to 421 prior to the granting of the franchise to 421." Once the Commissioner makes this factual determination, we, like other judicial tribunals, are bound by it so long as it is supported by substantial evidence. N.C. Gen. Stat. § 150A-51(5) (1983). *See id.* § 20-300 (noting that appeals from the Commissioner are governed by the Administrative Procedures Act). This level of review is the "whole record test," that is, whether the administrative decision has a rational basis in the evidence. *In re Rogers*, 297 N.C. 48, 64, 253 S.E. 2d 912, 922 (1979); *North Carolina Department of Correction v. Gibson*, 58 N.C. App. 241, 293 S.E. 2d 664 (1982). In applying this test, this Court does not substitute its judgment for that of the agency, even if it could have legitimately reached a differing result upon a *de novo* review of the record. *Thompson v. Wake County Board of Education*, 292 N.C. 406, 410, 233 S.E. 2d 538, 541 (1977).

There was ample evidence presented at the hearing to support the Commissioner's determination. Pennell testified that he

---

7. Appellants also argued that Pennell did not have "clean hands" and that the courts below erred in denying their request for a stay. Since we find for appellants on their challenge to the Commissioner's issuance of an injunction, we need not address these issues and express no opinion as to them.

had received no written notice. While he did receive a letter from AMC dated 30 October 1979, that document did not mention the granting of a franchise to 421. Attorneys for AMC admitted that no written notice was provided the Commissioner. Furthermore, agents for AMC testified regarding a letter of 8 June 1979 to Pennell dealing with a "one-on-one" proposal. No evidence suggested, however, that mentioning of a one-on-one proposal amounted to the written notice of an intention to grant a new franchise as required by the statute.

From this evidence, the Commissioner could reasonably have found that Pennell received no written notice from AMC as required by the statute. The Commissioner's finding on this issue is supported by substantial evidence on the whole record. *The North Carolina State Bar v. Dumont,* 304 N.C. 627, 643, 286 S.E. 2d 89, 98-99 (1982).

## V.

In conclusion, we affirm the North Carolina Court of Appeals' determination that N.C. Gen. Stat. § 20-305(5) does not create or perpetuate monopolies in violation of Article I, section 34 of the North Carolina Constitution, either on its face or as applied in this case. We affirm both Judge Bailey's and the Court of Appeals' decisions that the Commissioner correctly concluded that Pennell did not receive the written notice required under the statute. Insofar as both Judge Bailey and the Court of Appeals sustained the Commissioner's order revoking and invalidating American Motors' franchise to Vickers, their decisions are affirmed. Insofar as Judge Bailey and the Court of Appeals sustained the Commissioner's order enjoining future actions by American Motors and Vickers, their decisions are reversed.

Affirmed in part; reversed in part.

Justice MITCHELL did not participate in the consideration or decision of this case.